**Ex parte Gabriel GONZALES, Applicant.**

**No. AP–73775.**

Court of Criminal Appeals of Texas.

Oct. 18, 2006.

---

Michael C. Gross, San Antonio, for Appellant.

Edward F. Shaughnessy, III, Assistant Criminal District atty., San Antonio, Matthew Paul, Austin, for State.

WOMACK, J., delivered the opinion of the Court, in which MEYERS, PRICE, JOHNSON, HOLCOMB, and COCHRAN, JJ., joined.

This is a post-conviction application for a writ of habeas corpus filed pursuant to Code of Criminal Procedure article 11.071. On July 20, 1994, the applicant and four other members of the "Crips" gang committed robbery at a pawn shop to get firearms and money. Only the applicant and one other suspect were armed with guns. While his accomplices were smashing display cases and stealing guns, the applicant chased one of the proprietors of the shop into the back of the store and shot her. Then he returned to the cash register and forced an employee to open

it.[1]  On February 19, 1997, he was convicted of capital murder and sentenced to death. We affirmed his conviction on direct appeal.[2]

In his writ application, the applicant presents six "claims" for relief. After a hearing, the convicting court made findings of fact and conclusions of law, and it recommended that relief be denied. As to five of the claims, we agree that relief should be denied in accordance with the findings and conclusions of the convicting court. We set this case for consideration of the applicant's claim that his trial counsel provided ineffective assistance under the Sixth Amendment by failing to present, at the punishment phase of his trial, mitigating evidence of the abuse that the applicant suffered at the hands of his father, and the effects it had on him.

To show that his trial counsel was ineffective, the applicant must meet the two-pronged test articulated in *Strickland v. Washington*.[3]  First, he must show that his counsel's performance was deficient.[4]  In order to satisfy this prong, the applicant must demonstrate that counsel's performance fell below an objective standard of reasonableness, considering the facts of the particular case and judged at the time of counsel's conduct.[5]  Second, the applicant must show that counsel's performance prejudiced his defense at trial.[6]  In order to satisfy this prong, an applicant must show there was a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circum-

1. *See Gonzalez v. State,* No. 72,804 (Tex.Cr. App. September 16, 1998) (not designated for publication), at 3–4.

2. *See id.*

3. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

4. *See id.,* at 687, 104 S.Ct. 2052.

5. *See id.,* at 688, 690, 104 S.Ct. 2052.

6. *See id.,* at 692, 104 S.Ct. 2052.

stances did not warrant death.[7] Texas' capital sentencing scheme does not involve the direct balancing of aggravating and mitigating circumstances. It asks the jury to answer a mitigation issue.[8] We have adapted the Supreme Court's prejudice test to require a showing that there is a reasonable probability that, absent the errors, the jury would have answered the mitigation issue differently.[9] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[10]

### Counsel's Performance

■ The applicant alleges, and the convicting court found as a matter of fact, that his father physically and sexually abused him severely and frequently when he was a small child. As a result, he suffers from a post-traumatic stress disorder.[11] None of these facts were put in evidence at his trial.[12]

The applicant's father also abused the applicant's older sister, who eventually reported it to her mother. The applicant's mother had thought that her husband was sexually abnormal, and that he used excessive force with the children. When her daughter reported being sexually abused, she immediately notified the police and obtained a divorce.[13]

The defense attorney talked to the mother once before trial, and to the sister once during trial.[14] He did not ask them or the applicant about any specific topics such as abuse in the applicant's past.[15] His interviews with the mother and sister started "globally in nature," but he "never even dreamed" of the issue of abuse, and he "certainly didn't really inquire about it."[16] He did ask the applicant about how he grew up. "I just start from the beginning, you know, tell me all about you. Where were you born and so forth, leading them up to—to this time."[17] The applicant did not volunteer any information about abuse.[18] The sister testified at the habeas hearing that she did not volunteer information about the abuse because she is ashamed of having been abused and it is

7. See id., at 695, 104 S.Ct. 2052.

8. "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." TEX.CODE CRIM. PROC. art. 37.071, § 2(e)(1).

9. Where a defendant challenges his death sentence on the ground of ineffective assistance of counsel at the punishment phase, the Supreme Court's test for prejudice is whether there is a reasonable probability that, absent the errors, the jury would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death. See Strickland, 466 U.S., at 695, 104 S.Ct. 2052. We have adjusted this test to accommodate the Texas capital sentencing scheme, which does not involve the direct balancing of aggravating and mitigating circumstances.

See Ex parte Davis, 866 S.W.2d 234, 239 (Tex. Cr.App.1993).

10. Strickland, 466 U.S., at 694, 104 S.Ct. 2052.

11. Trial Court's Findings of Fact and Conclusions of Law, Clerk's Record [hereinafter "CR"] 176, 197.

12. Id., at 198.

13. Id., at 99–103.

14. Id., at 199, 200.

15. Id., at 199–200.

16. Reporter's Record [hereinafter "RR"], at 77.

17. Id., at 76.

18. Trial Court's Findings of Fact, CR, at 202.

not very easy to talk about.[19]

The applicant's counsel had tried "quite a few capital cases," and his experience was that evidence of a young defendant's background would have been very helpful in trying to get a life sentence instead of a death sentence. In retrospect, he said, "I really should have pursued this or at least inquired into it, but I did not."[20] His failure to do so was not a strategic or tactical decision, and he believes it was a mistake on his part.[21]

The sister did testify at the punishment stage of the trial that the applicant was bullied in school, that he had trouble learning, and that he had been diagnosed as being "borderline retarded" and suffering from epilepsy (as did his father) and attention-deficit disorder.[22] The applicant's mother was not called to testify.[23]

After the trial and before the habeas hearing, a board-certified psychiatrist interviewed the applicant and examined his school records and jail records. His diagnoses were that the applicant suffers from chronic post-traumatic stress disorder, attention-deficit disorder with hyperactivity, mixed personality disorder with explosive and antisocial traits, hereditary epilepsy, dyslexia and other learning disorders.[24] The psychiatrist's version of the applicant's history says:

"From that point [of his parents' divorce] on," Gabriel had extreme homophobic reactions, especially any insinuation that he was "Gay" or if he was called "Gay," he reacted in a very agitated manner. It was this trigger that caused him to exhibit run-a-way [sic] behavior and exhibit "macho" behavior

and run the streets. He lived twenty-four hours a day in terror that he would be labeled "gay."[25]

The psychiatrist's "psychodynamic formulation" included his opinion that:

"This is an individual who at an early age had [neurological and learning disorders]. He also had stigmata of Post Traumatic Stress Disorder as a result of extensive sexual abuse and molestation by his genetic father. He apparently was threatened with homicidal intention, by the perpetrator, if he revealed to his mother that this behavior was going on.

This individual also has a Borderline Normal Intelligence Quotient which would lead to poor processing of information and probably lower level of control of behaviors which included antisocial behaviors and impulsive behaviors at an early age. There was extensive drug abuse at an early age which extended into adult age with participation in buying and selling drugs.

This is an individual who has received many educational services, marginal psychiatric services as a child, and evolved into a very impulsive, angry adult whose trust was destroyed because of sexual molestation as a child. He, therefore, was not able to evolve deep interpersonal relationships that are so important for someone to learn to control and monitor his own behavior so that he was able to function in a job as a normal productive citizen.

This individual would require extensive psychiatric treatment for Post Traumatic Stress Disorder and Chemi-

19. RR, at 111.

20. *Id.,* at 78.

21. Trial Court's Findings of Fact, CR, at 201.

22. *Id.,* at 198.

23. RR, at 103.

24. Application, Exhibit K, at 6 (CR, at 106).

25. *Id.,* at 5 (CR, at 105).

cal Dependence in order to be rehabilitated in to [*sic*] a law-abiding, productive member of society." [26]

■ Because trial counsel was not aware, at the time of trial, that the applicant suffered an abusive childhood, the issue is not whether he was ineffective for failing to present evidence of abuse, but rather whether he failed to conduct a reasonable investigation to uncover mitigating evidence.[27] Or, more directly, was the applicant's trial counsel ineffective for failing to ask the applicant—or his mother or sister—if he was abused as a child?

The trial court accepted as true the applicant's account of the abuse, that the applicant's mother and sister were aware of the abuse, and that trial counsel did not ask specific questions about it.

The trial court noted that trial counsel was of the opinion that he made a mistake, and not a strategic choice, in failing to ask the applicant and his family about abuse. The trial court was not persuaded, however, that defense counsel conducted an unreasonable investigation because "this information was all known to Applicant, who was legally competent to stand trial, and he made no mention of it to his trial counsel." [28]

■ Defense counsel's failure to investigate the basis of his client's mitigation defense can amount to ineffective assistance of counsel.[29] In determining whether counsel conducted a reasonable investigation, an appellate court's initial inquiry is whether a reasonable investigation should have uncovered the mitigating evidence.[30]

The Supreme Court held in 1989 that the application of Texas' capital sentencing statute was in violation of the Cruel and Unusual Punishments Clause because "the jury was not provided with a vehicle for expressing its reasoned moral response to ... evidence [of a capital defendant's mental retardation] in rendering its sentencing decision." [31] Thereafter, many defendants who had been sentenced to death without such a "vehicle" raised such claims. Many of the claims failed because the mitigating evidence could have been given effect under the statute, or because there was no evidence of a nexus between the evidence and the commission of the offense.[32]

---

26. *Id.*, at 7 (CR, at 107).

27. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S., at 691, 104 S.Ct. 2052.

28. Trial Court's Conclusion of Law, CR, at 208.

29. *See Williams v. Taylor*, 529 U.S. 362, 395–97, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (reaffirming state trial court's decision to grant new sentencing trial on ground that counsel provided ineffective assistance by failing to uncover certain mitigating evidence).

30. *See Baxter v. Thomas*, 45 F.3d 1501, 1513 (11th Cir.1995).

31. *Penry v. Lynaugh*, 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

32. *See, e.g., Richardson v. State*, 879 S.W.2d 874 (Tex.Cr.App.1993) (mother in and out of penal institutions, never knew father, raised in poverty with little supervision, sometimes went hungry, sometimes stole food, went to state institutions for children, illiterate, stuttered, slow learner); *Chambers v. State*, 866 S.W.2d 9 (Tex.Cr.App.1993) (father never home, father blew marihuana smoke in face, violence toward women at home, mother remarried, dropped out of school, attempted suicide, denied assistance by MHMR, almost froze, never been convicted of felony); *Elliott v. State*, 858 S.W.2d 478 (Tex.Cr.App.1993) (dropped out of school, raised by single parent in housing project, behaved well in jail, had religious conversion); *Zimmerman v. State*, 860 S.W.2d 89 (Tex.Cr.App.1993) (twice abandoned as child, some child abuse, good to mom, metal plate in skull, low-average IQ, paranoid personality); *Gunter v. State*, 858 S.W.2d 430 (Tex.Cr.App.1993) (age 20, aban-

In other cases, we found a violation of the Eighth Amendment. These included a case in which a defendant presented evidence of sociopathic personality brought on by childhood abuse,[33] and a case in which there was evidence of a defendant's low IQ, poverty and parental mistreatment.[34]

In 1991, the statute was amended to comprise a much broader range of mitigating evidence, namely, "all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant." [35]

■ These developments in constitutional and statutory law have made it necessary to consider mitigating evidence in preparation for the trial of a capital case. Such evidence could include the circumstances of the defendant's childhood and his physical and mental health. We think that, at the time of the applicant's trial, an objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child. Counsel's performance fell below this standard.

### Prejudice

■ Having established that the performance of the applicants trial counsel fell below reasonable standards, the applicant also must demonstrate that his counsel's performance prejudiced his defense, in order to establish a Sixth Amendment violation.[36] Under *Strickland,* an applicant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[37] A reasonable

doned by mother, adopted by strict parents, emotional and behavioral problems, hearing impairment, learning disorder); *Satterwhite v. State,* 858 S.W.2d 412 (Tex.Cr.App.1993) (inadequate parenting, father absent, mother alcoholic, poverty, IQ of 74); *Ex parte Kunkle,* 852 S.W.2d 499 (Tex.Cr.App.1993) (youth, use of drugs and alcohol at time of crime, depressed parents, and expulsion from home); *Muniz v. State,* 851 S.W.2d 238 (Tex.Cr.App. 1993) (raised in poverty by single parent, religious, generous and loving, good son and brother, involved in church activities, and had developed artistic abilities); *Johnson v. State,* 853 S.W.2d 527 (Tex.Cr.App.1992) (absence of violent behavior, record of hard work, an impeachment of State's expert witness of future dangerousness); *Ex parte Baldree,* 810 S.W.2d 213 (Tex.Cr.App.1991); *Black v. State,* 816 S.W.2d 350 (Tex.Cr.App.1991),(good employee, boy scout leader, good child, helpful adult, veteran); *Ex parte Bower,* 823 S.W.2d 284 (Tex.Cr.App.1991) (good and non-violent character, good deeds, no criminal record); *Boyd v. State,* 811 S.W.2d 105 (Tex.Cr.App. 1991) (good work record, weeping when arrested, polite and helpful, respectful, helped his sister, considerate to girlfriend and child, had a stepfather, took care of his mom); *Ex parte Ellis,* 810 S.W.2d 208 (Tex.Cr.App.1991)

(drug problem, suicide attempt, lack of education, close family ties); *Lackey v. State,* 816 S.W.2d 392 (Tex.Cr.App.1991) (low IQ, troubled childhood, age 23, voluntary intoxication, and history of periodic drinking with blackouts); *Richardson v. State,* 886 S.W.2d 769 (Tex.Cr.App.1991) (voluntary service and kindness to others, artistic and poetic talent, strict discipline by father, difficulty in learning to read, racial strife in childhood, religious devotion); *Lewis v. State,* 815 S.W.2d 560 (Tex.Cr.App.1991) (unhappy childhood); *Boggess v. State,* 855 S.W.2d 645 (Tex.Cr.App. 1991) (vision problems in childhood).

**33.** *Richard v. State,* 842 S.W.2d 279 (Tex.Cr. App.1992)

**34.** *Ramirez v. State,* 815 S.W.2d 636 (Tex.Cr. App.1991).

**35.** Act of June 16, 1991, 72d Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898, 2899, *now codified as* Tex.Code Crim. Proc. art. 37.071, § 2(e)(1).

**36.** *Strickland,* 466 U.S., at 692, 104 S.Ct. 2052.

**37.** *Id.,* at 694, 104 S.Ct. 2052.

probability is a probability sufficient to undermine confidence in the outcome.[38] In cases such as the one at hand, where there is no lower court decision with regard to prejudice, we will ourselves evaluate the evidence in aggravation and the available mitigating evidence, in order to determine how a jury might reasonably answer the mitigation special issue.[39] In doing so, we consider the totality of the evidence, "both that adduced at trial, and the evidence adduced in the habeas proceeding[s]."[40]

The aggravating evidence presented by the State at the original punishment hearing can be divided into three general categories. The first category was a recitation of the applicant's prior offenses, including a 1991 conviction for criminal trespass, convictions in 1993 for burglary of a vehicle and unlawful carrying of a weapon, an arrest in 1993 for possession of cocaine and possession of marijuana, and his apparent involvement in a 1993 pawn shop robbery with similar characteristics to the robbery in this case. The State also proved that the applicant had violated the terms of his probation by absconding from a court-ordered drug treatment facility. The second category was evidence of the applicant's various disciplinary infractions while residing in Bexar County detention facilities. Finally, the third category of aggravating evidence involved witnesses called to testify to the existence and nature of gang activity in Texas prisons. Through these witnesses' testimony, the State argued that the applicant's affiliation with the Crips would allow him to continue committing criminal and potentially violent acts even while incarcerated. The State bolstered this point by showing the jury a

letter that the applicant had written from his jail cell to a fellow Crip, in which the applicant offers to murder rivals on behalf of the letter's recipient once he gets to prison. In total, the State called nineteen witnesses during its punishment case-in-chief.

In his own punishment case-in-chief, the applicant called one witness: his sister, Demeris Gonzalez. Gonzalez testified that, in school, the applicant was always "a slow learner" who was often placed in special education classes. She said that he was often bullied because he was a small child, and that he was always more of a follower than a leader. She said that he was diagnosed with epilepsy, attention deficit disorder, and clinical depression. She said that their family situation was difficult because the family moved several times, and because of their parents' marital problems. She testified that both she and the applicant dropped out of high school before graduating, in his case because he had difficulties at school and because he was tired of being bullied. She said their parents divorced after their father had started to become physically abusive towards their mother, and that the applicant attempted to live with his father but that his father rejected him. Gonzalez also testified that the applicant became involved with gangs at the age of eighteen, after being initiated simultaneously with their younger brother. She said that the applicant often expressed a desire to leave the gang, beginning about three months after he first joined when he realized the things the gang was doing, but that he was too scared to do so.

In argument, the State spoke of the applicant's prior offenses and stressed the likelihood that the applicant would contin-

**38.** *Ibid.*

**39.** *See Wiggins v. Smith,* 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

**40.** *Id.,* at 536, 123 S.Ct. 2527 (quoting *Williams v. Taylor,* 529 U.S. 362, 397–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

ue his criminal gang activity while in prison. The State also suggested the applicant lacked remorse, as shown by the statement he reportedly made immediately after the crime at hand: "I smoked that white bitch." Finally, the State noted that the applicant's mitigation evidence consisted only of his sister's testimony, who understandably would be quite sympathetic to him.

The applicant's argument reiterated his sister's testimony, and attacked a few points made by the State's witnesses. The applicant also pointed out that two of his accomplices, who testified against him at trial, themselves received life sentences for participating in the same criminal transaction for which he had been convicted. Additionally, the applicant recalled firearm expert testimony from the guilt-innocence phase of trial that called into question whether the applicant actually could have shot the victim in this case.

The evidence and arguments at the punishment hearing would have been significantly different with the mitigating evidence adduced at the applicant's habeas hearing. The habeas court accepted as true that the applicant's father forced him to perform oral sex on him weekly beginning when the applicant was less than six years old, and that his father had anal intercourse with the applicant weekly from the time he was seven years old. The applicant's father was also physically abusive towards the applicant if he resisted, and would threaten to kill the applicant, as well as the applicant's mother, if the applicant ever told anyone about the abuse. The applicant's father also sexually molested the applicant's sister numerous times during her childhood. It is not clear from

the record when the abuse ended, but the applicant lived with his father until his parents divorced in 1988, when the applicant was fourteen years old.

The habeas court accepted as true the conclusions of Dr. Raymond D. Potterf, a board-certified psychiatrist who examined the applicant and diagnosed him as suffering from Post–Traumatic Stress Disorder due to the repeated physical and sexual abuse he suffered. Dr. Potterf also concluded that the applicant had a "Borderline Normal Intelligence Quotient which would lead to poor processing of information and probably lower level of control of behaviors which included antisocial behaviors and impulsive behaviors at an early age."[41] The habeas court accepted Dr. Potterf's conclusion that, if given extensive psychiatric treatment for Post–Traumatic Stress Disorder and Chemical Dependence, the applicant could perhaps become a productive, law abiding member of society.[42] None of this evidence was presented during the applicant's trial.

We believe the mitigating evidence presented at the habeas hearing is substantially greater and more compelling than that actually presented by the applicant at his trial. We cannot say with confidence that the facts of the capital murder and the aggravating evidence originally presented by the State would clearly outweigh the totality of the applicant's mitigating evidence if a jury had the opportunity to evaluate it again. In short, we conclude that the applicant's available mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of the applicant's moral culpability.[43] Therefore, there is at least a reasonable probability that, had this mitigating evidence been

---

41. Application, Exhibit K, at 7 (CR, at 107).

42. Trial Court's Findings of Fact, CR, at 198.

43. *Wiggins*, 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams*, 529 U.S., at 398, 120 S.Ct. 1495).

available at the applicant's original punishment hearing, a different result would have occurred, such that it undermines our confidence in the outcome.

*Conclusion*

The application for relief from the punishment portion of the judgment is granted. The applicant is remanded to the trial court for a new punishment hearing or other proceedings consistent with this opinion.

COCHRAN, J., filed a concurring opinion.

KELLER, P.J., filed a dissenting opinion.

KEASLER, J., dissented.

HERVEY, J., did not participate.

COCHRAN, J., concurring.

I join the Court's opinion. I write separately only to address a matter raised by Presiding Judge Keller in her dissenting opinion. Judge Keller states that, in *Summerlin v. Schriro*,[1] "the Ninth Circuit may have suggested the same rule the Court announces in the present case."[2] If one inverts that sentence to read, "this Court may be suggesting the same rule the Ninth Circuit announced in *Summerlin v. Schriro*," I agree with her assessment. Although the majority in this case does not speak with the breadth of the

Ninth Circuit, I think that any capital-murder defense counsel in Texas should read *Summerlin* before beginning his pre-trial investigation.

The underlying message of *Summerlin* is that defense counsel must fully investigate any and all potential mitigating circumstances in his client's background which might conceivably persuade a jury not to impose the death penalty. The failure to investigate will not be excused simply because the defendant failed to mention such evidence himself. Indeed, under *Rompilla v. Beard*,[3] defense counsel may be required to investigate potential mitigating facts even when the defendant is "uninterested in helping" or is "even actively obstructive" in developing a mitigation defense.[4]

Under both current Supreme Court standards and Texas statutes, defense counsel has a constitutional duty to seek out all of the "circumstances of the offense, the defendant's character and background, and [any evidence that lessens] the personal moral culpability of the defendant[.]"[5] At a minimum, defense counsel must privately quiz his client about any and all positive and negative facts about the defendant's upbringing, personality, social interactions, thoughts and feelings. It is not sufficient to inquire generally and leave it up to the defendant to raise topics or respond to open-ended questions. Like a doctor, defense counsel must be armed

---

1. 427 F.3d 623 (9th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 1880, 164 L.Ed.2d 567 (2006).

2. *Infra*, slip op. at 403 (Keller, P.J., dissenting).

3. 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

4. *Id.* at 381, 125 S.Ct. 2456; *Summerlin*, 427 F.3d at 638 (" 'a lawyer's duty to investigate is virtually absolute, regardless of a client's

expressed wishes' ") (quoting *Silva v. Woodford*, 279 F.3d 825, 840 (9th Cir.2002)).

5. *See generally, Rompilla; Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); Tex.Code Crim. Proc. art. 37.071, § 2(e)(1). Because this offense was committed, investigated, and tried between 1994 and 1997, the current statutory mitigation issue was applicable to the punishment phase, as was counsel's duty to investigate all facts which might be relevant to that special issue.

with a comprehensive check-list of possibilities, and forcefully inquire about each topic. Such topics might include:

* Childhood accidents and injuries;
* Trips to the emergency room;
* Serious illnesses at any time;
* Physical abuse to the defendant or any other member of the family;
* Any sexual abuse to the defendant or any other member of the family;
* Size of the immediate family, and a history of the physical, educational, and emotional background of each member;
* The defendant's relationship with and attitudes toward every member of the family;
* Drug or alcohol use or abuse by himself and any or all members of the family;
* Any mental health treatment of any member of the family, including the defendant;
* The cohesiveness of the family;
* The family's standard of living and living conditions;
* Any and all available school records;
* Any record of learning disabilities;
* Childhood and adult social relationships with members of the same and opposite sex;
* Any marriage, divorce, children, step-children, or surrogate family relationships, and their positive or negative influence upon the defendant;
* Any and all awards, honors, or special accomplishments, as well as any and all convictions, arrests, expulsions or suspensions from school, job firings, etc.;
* Any and all traumatic experiences;
* Any and all especially proud moments;
* Membership in religious, social, educational, charitable organizations;
* The client's five best and worst memories.

Only after a lengthy and thorough interview with his client will defense counsel be in a position to decide which are the most promising mitigation areas to pursue. Because of finite resources and time, capital counsel's strategic and tactical decisions regarding the further investigation, development, and use of potential mitigating evidence should be given great deference. But deference is not due to counsel who fails to interview his client at sufficient length and depth to discover, as accurately as possible, the unvarnished truth about his client. A particular defendant may be such an accomplished dissembler that he successfully hides important information from his own attorney; in that instance, of course, the defendant bears full responsibility for affirmatively hiding the truth. But capital counsel bears the responsibility for at least making every reasonable attempt to uncover possible mitigation facts from his client.

To that extent, at least, I think that the majority would agree with the reasoning of *Summerlin*, as do I.

KELLER, P.J., dissenting.

The Court holds that counsel was ineffective because he did not ask applicant or his family whether applicant had been abused as a child. The Court points out that counsel did ask applicant to relate how he grew up and that counsel conducted interviews with applicant's mother and sister that started "globally in nature." The Court does not claim that these interviews, or any other information possessed by counsel, suggested in any fashion that abuse might have been an issue in the case, nor does the Court point to any "leads," which, if diligently followed, could

have resulted in uncovering the abuse evidence now presented before us. Rather, the Court appears to be articulating a *per se* rule requiring counsel to specifically inquire into the question of abuse in every capital murder prosecution. Basically, counsel must always ask the defendant, "Were you abused as a child?" and must pose similar questions to any available family members.

The Court cites no cases imposing such a requirement at the time counsel represented applicant, and I have found none. There are cases from the 1990's suggesting that counsel is *not* required to inquire into a subject without some sort of indication that the subject might be an issue in the case. In holding that counsel was not ineffective for failing to investigate and discover mental disorders allegedly suffered by the defendant, the Tenth Circuit explained that counsel was not aware that this mental impairment claim was a possible issue because "essential and foundational information required to trigger such a claim [was] withheld from the defendant's attorney by the defendant himself." [1] The court suggested that counsel cannot be faulted for "failing to raise claims as to which the client has neglected to supply the underlying facts ... clairvoyance is not required of effective trial counsel." [2] The Fifth Circuit found that counsel was not ineffective when he accidentally elicited testimony that appellant had sexually abused a witness in the case because the defendant did not inform

counsel of the abuse and there was no evidence that counsel knew or should have known it. [3] In connection with its holding the Fifth Circuit observed, "In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel." [4]

In 1996, in *Lambrix v. Singletary*, the Eleventh Circuit rejected (in a death penalty case) an ineffective assistance claim based on an attorney's failure to discover the defendant's "childhood experiences of sexual abuse [and] physical abuse" by his parents and a neighbor. [5] The court explained that, during defense counsel's investigation, neither the defendant nor his relatives gave any indication that the defendant had suffered such experiences. [6] There was no documentary evidence of abuse or neglect, and, in an interview with a defense psychologist, the defendant "denied any physical or sexual abuse by his parents." [7] Although the defendant had not specifically denied sexual abuse by the neighbor, the court concluded, in light of the defendant's brother's testimony at the sentencing hearing portraying the neighbor as a good influence, that counsel had no indication that the abuse had occurred. [8] Consequently, the court concluded that "nothing ... put the counsel on notice of the existence of the [abuse] evidence," and therefore, counsel was not ineffective. [9]

Although the defendant's denial of abuse with respect to his parents is a fact that could distinguish *Lambrix* from the pres-

---

1. *United States v. Miller*, 907 F.2d 994, 999 (10th Cir.1990).

2. *Id.* (quoting *Dooley v. Petsock*, 816 F.2d 885, 891 (3rd Cir.1987)).

3. *Lackey v. Johnson*, 116 F.3d 149, 152–153 (5th Cir.1997).

4. *Id.* at 152.

5. 72 F.3d 1500, 1505–1506 (11th Cir.1996), *aff'd*, 520 U.S. 518, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).

6. *Id.* at 1505.

7. *Id.* at 1505–1506.

8. *Id.* at 1506 n. 9.

9. *Id.* at 1506.

ent case, the Eleventh Circuit opinion could nevertheless be taken to suggest that a defense attorney has no duty to inquire about abuse where he has not been supplied with a reason to suspect it had occurred. The *Lambrix* court did not suggest that counsel himself ever asked the defendant whether he had been abused nor did it suggest that his family members were asked by *anyone* whether abuse had taken place. The court specifically noted that appellant had not denied abuse by the neighbor, but counsel was not taken to task for failing to ask the defendant a broad question regarding abuse that might have elicited the information.

In 2003, the question before us was directly confronted in a death penalty case by the Supreme Court of Mississippi in *Simon v. State,* where the court held that it would *"not* find that trial counsel's conduct fell below the ordinary standard of assistance of counsel because he did not inquire—without prompting—into the possibility of abuse of his client as a child." [10] The court observed that none of the defendant's post-trial affidavits alleged that "counsel was ever told before or during the sentencing phase of trial that Simon was abused as a child." [11]

In its recent opinion in *Summerlin v. Schriro,* the Ninth Circuit may have suggested the same rule the Court announces in the present case.[12] The Ninth Circuit contended that counsel's "investigation should include inquiries into social background and evidence of family abuse." [13]

The court also said that defense counsel's inquiry should include the examination of mental health records, the defendant's physical health history (for evidence of organic brain damage and other disorders), and any history of drug and alcohol abuse.[14] The court commented that its list was "not meant to be exhaustive, but only illustrative of the minimal type of 'objectively reasonable' investigation any competent capital defense attorney should conduct in preparing a penalty phase defense, even at the time Summerlin's case was tried." [15] Summerlin's case was tried in 1982.[16]

Confronting the facts before it, the Ninth Circuit held that had defense counsel "conducted even a minimal investigation," he would have learned of the following: (1) the defendant's "tortured family history, including the fact that" his "alcoholic mother beat him frequently and punished him by locking him in a room with ammonia fumes," (2) that the defendant's mother sent the defendant to receive "electroshock treatments to control his explosive temper," (3) that the defendant had "a learning disability that left him functionally mentally retarded," and (4) that the defendant "had been diagnosed as a paranoid schizophrenic and treated with antipsychotic medication." [17]

To the extent that the Ninth Circuit's opinion can be interpreted as concluding that competent counsel would have known in 1982 to specifically inquire into the pos-

---

**10.** 857 So.2d 668, 685 (Miss.2003)(emphasis added), *cert. denied,* 541 U.S. 977, 124 S.Ct. 1885, 158 L.Ed.2d 475 (2004).

**11.** *Id.*

**12.** 427 F.3d 623 (9th Cir.2005), *cert. denied,* —— U.S. ——, 126 S.Ct. 1880, 164 L.Ed.2d 567 (2006).

**13.** *Id.* at 630.

**14.** *Id.*

**15.** *Id.* at 631.

**16.** *See Summerlin v. Stewart,* 341 F.3d 1082, 1089 (9th Cir.2003), *rev'd,* 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

**17.** *Summerlin v. Schriro,* 427 F.3d at 631.

sibility of abuse, *even absent any leads,* I must disagree. The court cited no cases or any other authority for that proposition, and the only case it cited for the proposition that counsel has a duty to investigate was another 2005 Ninth Circuit decision, *Boyde v. Brown.*[18] In *Boyde,* however, the attorney was aware of evidence of abuse but failed to investigate it further.[19] In any event, *Summerlin* could be construed as holding, not that counsel would be ineffective for failing to inquire into a closely guarded secret known only to the defendant and his family, but that counsel was in fact ineffective because the abuse, and the mental damage it caused, was *not* a closely guarded secret, but was supported by an abundance of documentary evidence that could have readily been found.

In the present case, counsel did talk to applicant and members of the family, and the interviews afforded the opportunity to talk about the abuse applicant now alleges he suffered. I respectfully disagree with the Court's claim that reasonably competent counsel would have known, at the time he represented applicant in this case (1994–1997), that he had a duty to specifically raise the topic of abuse in the absence of any indication whatsoever that any abuse had occurred.

---

18. *Id.* at 630 (citing *Boyde,* 404 F.3d 1159, 1176 (9th Cir.2005)).

19. *Boyde,* 404 F.3d at 1176–1177.