Opinion issued February 24, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-09-00848-CR

———————————

Reynaldo Amaya,
Appellant

V.

The State of Texas, Appellee



 



 

On
Appeal from the 185th District Court

Harris
County, Texas



Trial Court Case No. 1186977

 



 

MEMORANDUM OPINION

Appellant, Reynaldo Amaya, was charged
by indictment with aggravated assault.[1]  Appellant pleaded not guilty.  A jury found appellant guilty and sentenced him
to 18 years’ confinement.  Following the
trial, appellant obtained new counsel and filed a motion for new trial,
alleging ineffective assistance of counsel. 
A hearing was held, and the trial court denied the motion.  In two points of error, appellant argues that
he was denied effective assistance of counsel in the guilt-innocence phase and
in the punishment phase of the trial.

We affirm.

                                                                                                                                                                
Background

Dawn Rowland, complainant, was at the West End Pub with
some friends on the night of October 4, 2008. 
Appellant was also at the bar with Sherrie Carroll, his girlfriend at
the time, and Manuel Matala.  At a
certain point, appellant ordered some drinks for Rowland and one of her friends.  Rowland and her friend declined the
drinks.  Rowland testified that appellant
subsequently made repeated crude comments and gestures to her.

Rowland complained to the owner of the bar.  The owner told her he would take care of it.  She also told Michael Lewis, a friend that
she knew from the bar, that appellant was harassing her.  The owner told Lewis he could ask appellant
to leave.  Lewis approached appellant and
told him he had to leave.  Appellant
became aggressive and a brief fight ensued. 
Appellant threatened to call for police assistance, but later left.

After the bar closed, Rowland left with Andrea
Hunsucker.  They planned to drive their
cars to another friend’s house.  As she
left, she noticed a car pull up behind her and begin following her.  Another person that was at the bar that night
and that saw the fight between Lewis and appellant testified that he saw
appellant and his girlfriend in a silver or gray BMW follow Rowland’s car out
of the parking lot.

When she arrived at her destination, Rowland saw a man
approach her car and smash in the driver’s side window.  The man hit her with a crowbar.  Rowland escaped outside the passenger’s side
window and attempted to run away.  She
fell when the assailant hit her knees. 
The assailant continued to hit her over 20 times with the crowbar,
yelling things like “this is how it feels.” 
At this point, Rowland recognized appellant as the assailant.

Hunsucker witnessed the assault and recognized appellant
as well.  She was talking on her cell
phone to her friend in the house, Colby Van Cleave, and yelled for help.  When Van Cleave ran out of the house, he saw
a silver BMW speeding away.  Van Cleave
picked up a cinder block he kept on his property and threw it at the car.  The cinder block hit one of the side mirrors
on the car.  Later, a piece of a car
mirror was found on the street where Van Cleave had thrown the cinder block.

One of the investigating officers later located
appellant’s silver BMW at a repair shop. 
The car had sustained damage to one of the side mirrors and one of the
doors, though the mirror fragments from the damaged side mirror had already been
removed.  Additionally, blood samples
found on the front passenger seat, the interior driver’s door, and the hood of
Rowland’s car matched appellant’s DNA.

Appellant took the stand in both the guilt-innocence phase
and the punishment phase of the trial. 
In the guilt-innocence phase, appellant admitted to being at the bar
with Carroll and Matala and to ordering drinks for Rowland and her friend.  He denied speaking to Rowland or making any
lewd gestures at her.  Appellant
testified that Lewis started the fight and that he got punched and kicked in
the head during the fight.  Appellant
testified that he was told that the police had been called and stayed outside
the bar waiting for them.  He also
testified that he called the Fort Bend County Sheriff’s Office even though the
offense occurred in Harris County. 
Because the police did not arrive while he was waiting and because
Carroll and others were urging him to leave, appellant finally left.

Appellant testified that Carroll drove them home, that it
only took about 10 to 15 minutes to get home, and that he was thinking about
how he was ashamed and embarrassed during the ride home.  He testified that during the ride home he
heard a thud, Carroll asked what the sound was, and he said he didn’t care and
to go home.  Appellant later attributed
this unknown sound to the damage to his door and side mirror.

Appellant repeatedly asserted that he never attacked
Rowland.  He could not explain, however,
how blood found at the scene of the crime matched his DNA. During his
testimony, the following exchange took place:

Q.      When
you say you don’t have an explanation or an answer to questions like what
happened to your door or what happened to Ms. Rowland other than what we know
here because of the trial, or how your DNA could have possibly gotten into her
car, are you being truthful when you make those statements?

A.      Yes,
ma’am.

Q.      Are
you trying to hide behind intoxication or a faulty memory?

A.      No,
ma’am.

Q.      Are
you trying to hide behind any injuries you may have sustained that night?

A.      No,
ma’am.

Q.      You’re
saying that because you don’t know the answers to those questions, correct?

A.      That’s
correct.

During the trial, an audio recording was admitted into
evidence containing appellant’s statement to police about four days after the
incident.  In that statement, appellant
said he was jumped at the bar but insisted that he did not talk to any girl
other than his girlfriend.  He also said
that they drove his girlfriend’s Toyota to the bar and back to his place and
that his BMW was at home the entire time. 
He told the officer that they drove straight to his apartment.  He admitted that his BMW was in the shop for
repairs but said it was because some kids had thrown something at the car
around dusk time the previous Saturday. 
He identified a movie that was playing on a television station when he
got home.  Finally, he said he showered
and went to bed.

Carroll and Matala testified for appellant as well.  Their testimony corroborated the testimony of
appellant.  Matala testified that
appellant did not make any crude gestures or comments to Rowland and that Lewis
started the fight.  Carroll testified similarly,
adding that she drove appellant directly to his home and that appellant never
attacked Rowland.

The jury found appellant guilty of aggravated
assault.  During the punishment phase,
appellant again testified, and the following exchange took place:

Q:      And what
do you do as far as -- or do you do any volunteer work or community work with
churches or anything like that?

A:      Yes,
ma’am.  Back when I was -- I used to
fight, kickboxing. I’ve held some -- I fought for a world title in 2000 in
Canada, ISKA world title kickboxing.  I
hold the Southwest Texas kickboxing title.  I hold the Texas kickboxing title and I hold the
US kickboxing title, full contact.

          I
wanted to pass that along . . . .

The jury assessed punishment at 18 years’ confinement.

After the trial, appellant obtained new counsel and filed
a motion for new trial, arguing he had received ineffective assistance of
counsel.  Appellant argued that he
received ineffective assistance of counsel due to her failure to investigate
and present testimony that appellant “suffers from a mental illness, disease,
or defect that may have prevented him from forming the requisite culpable
mental state to commit aggravated assault” and “that minimized his moral
blameworthiness.”

At the hearing, appellant’s counsel presented the
affidavits of appellant’s trial counsel, appellant, a psychiatrist, and a
neuropsychologist.  Appellant’s trial
counsel, Kennitra Foote, stated in her affidavit:

When I prepared for trial, I did not know that [appellant]
might suffer from a mental illness or defect.  I had no way of knowing this information, nor
was it reported to me that [appellant] had a history of head trauma and
dementia.  Had I known that information
and recognized the possibility that his mental health could be relevant to
guilt-innocence and/or punishment, I would have had him evaluated before trial
by a mental health professional.   I
neither hired a mental health professional to evaluate him nor presented
evidence at trial regarding his mental health.  My failure to conduct this investigation and
present this evidence was not strategic.

Appellant stated in his affidavit:

Ms. Foote did not ask me before trial about my mental
health history or if I had a history of head injuries, nor did I have any
reason to volunteer this information. Had she asked, I would have told her that
I have an extensive history of closed head injuries from years of kickboxing . . . .

The psychiatrist, Dr. A. David Axelrad, described in his
affidavit the relevant information provided to him in an interview with appellant.  In that interview, appellant told Dr. Axelrad
that he had a history of significant alcohol use starting from the age of 12 or
13 and that there is a history of alcohol abuse in his family.  He also told Dr. Axelrad that he began training
in kickboxing in 1994 and began competing. 
During that time, he suffered three concussions “and he would frequently
sustain closed head injuries during the course of this experience.”

Dr. Axelrad noted in his affidavit that appellant was
significantly intoxicated and received blows to the head on the night of the
assault.  Dr. Axelrad also stated in his
affidavit:

It is to be noted that [appellant] has no memory for [sic] any of the events involved in the
commission of the offense of Aggravated Assault against . . .
Rowland.  [Appellant] did testify in both
the guilt and punishment phases that he has no memory of being involved in the
commission of the aggravated assault against . . . Rowland.

Dr. Axelrad reported in his affidavit that appellant
“has experienced significant problems with his memory over the course of the
last several years.”

Dr. Axelrad concluded that appellant “is mildly impaired
as a result of his underlying psychiatric disorders” but also concluded that
any further diagnosis would require a psychological evaluation by a
neuropsychologist.

The neuropsychologist, Dr. Larry Pollock, noted
appellant’s history of head trauma but made no mention of appellant’s history
of alcohol abuse.  Dr. Pollock stated in his
evaluation:

[Appellant] was suffering from Chronic Traumatic
Encephalopathy associated with years of kickboxing before the events in
question.  My evaluation also indicated
that he suffered an Acute Traumatic Brain Injury and Post-Traumatic Amnesia
immediately before the alleged offense. 
Post-Traumatic Amnesia is the result of trauma to the brain and involves
a significant alteration in consciousness, impaired cognitive functioning, and
memory loss.  Consequently,
Post-Traumatic Amnesia disrupts rational, goal-directed behavior and causes
disinhibition of neurological regulation of behavior.

Dr. Pollock concluded that, because of these
impairments, appellant was not “capable of forming the requisite culpable
mental state to commit an aggravated assault. 
It is possible that, because of his mental condition at the time of the
events in question, he engaged in the alleged conduct but truthfully does not
remember having done so.”

Dr. Axelrad provided a subsequent affidavit where he
stated that he had reviewed Dr. Pollock’s report, discussed it with him, and
agreed with his conclusions.  He also
stated, “I conclude that, within reasonable medical probability, [appellant]
did not act intentionally or knowingly when he engaged in the alleged conduct.  I do not believe that he was capable of forming
the necessary culpable mental state to commit an aggravated assault.”

The trial court denied the motion for new trial, finding,
among other things, that Foote did not have any indication that appellant had
any sort of mental health issue and that the testimony of appellant regarding
the events of the night in question were clear and concise, as was appellant’s
statement to the police.  The trial court
also noted that appellant’s testimony regarding the events of the night were
corroborated by the testimony of Carroll and Matala. 

                                                                                                                                                 
Standard of Review

The standard of review for evaluating claims of
ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064
(1984).  Strickland generally requires a
two-step analysis in which an appellant must show that (1) counsel’s
performance fell below an objective standard of reasonableness and (2) but for
counsel’s unprofessional error, there is a reasonable probability that the
result of the proceedings would have been different. Id. at 687–94, 104 S. Ct. at 2064–2068; Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).  A reasonable probability is a “probability
sufficient to undermine confidence in the outcome.”  Strickland,
466 U.S. at 694, 104 S. Ct. at 2068.  In
reviewing counsel’s performance, we look to the totality of the representation
to determine the effectiveness of counsel, indulging a strong presumption that
his performance falls within the wide range of reasonable professional
assistance or trial strategy.  Thompson, 9 S.W.3d at 813.  The record must affirmatively support the
alleged ineffectiveness.  Id.

When the claimed ineffective assistance of counsel is
based on a failure to investigate, “a particular decision not to investigate
must be directly assessed for reasonableness in all the circumstances, applying
a heavy measure of deference to counsel’s judgment.”  Strickland,
466 U.S. at 691, 104 S. Ct. at 2066.  “In
assessing counsel’s investigation, we must conduct an objective review of their
performance, measured for ‘reasonableness under prevailing professional norms,’
which includes a context-dependent consideration of the challenged conduct as
seen ‘from counsel’s perspective at the time.’” 
Wiggins v. Smith, 539 U.S.
510, 523, 123 S. Ct. 2527, 2536 (2003) (quoting Strickland, 466 U.S. at 688, 689, 104 S. Ct. at 2052).

Appellant presented his ineffective assistance claim to
the trial court in a motion for new trial.  After a hearing, the trial court overruled appellant’s
complaint by denying the motion.  We
therefore analyze the ineffective assistance of counsel issue as a challenge to
the denial of the motion for new trial.  Charles v. State, 146 S.W.3d 204, 208
(Tex. Crim. App. 2004) (holding appropriate standard of review for ineffective
assistance claim brought forth in motion for new trial is abuse of discretion).
 In such circumstances, we review the
trial court’s application of the Strickland
test through an abuse of discretion standard.  Id.  Thus, we reverse only if the trial court’s
decision is arbitrary or unreasonable, viewing the evidence in the light most
favorable to the ruling.  Id.

                                                                                                                                               
Failure to Investigate

In his two points of error, appellant argues that he was
denied effective assistance of counsel due to his attorney’s failure to
discover appellant’s alleged mental impairment during the course of her
investigation.  Appellant argues that
this information would have been beneficial in both the guilt-innocence phase
and the punishment phase of his trial.

The record does not establish the extent and details of
Foote’s pretrial investigation.  Instead,
we know only that Foote did not discover, in the course of her investigation,
the alleged mental impairment diagnosed by Dr. Axelrad and Dr. Pollock.  Foote only stated in her affidavit that she
did not know that appellant “might suffer from a mental illness or defect” and
that it was not reported to her that he “had a history of head trauma and
dementia.”  Appellant stated in his
affidavit that Foote did not ask him about his mental health history or if he
had a history of head injuries.  We do
not otherwise know what actions Foote took to determine that further
investigation into appellant’s mental health was not necessary.  

Because we do not have any details of the investigation
performed by Foote, we must follow the “strong presumption that counsel’s
conduct falls within the wide range of reasonable professional assistance.”  Strickland,
466 U.S. at 689, 104 S. Ct. at 2065.  We
can only find Foote ineffective by finding that any reasonable investigation should
have uncovered the relevant evidence.  See Ex parte Gonzales, 204 S.W.3d 391, 396
(Tex. Crim. App. 2006).

In Purchase, we
held that there was no requirement that counsel must always ask a defendant
about his psychiatric history when there are no indicators of possible
incompetency.  Purchase v. State, 84 S.W.3d 696, 700–01 (Tex. App.—Houston [1st
Dist.] 2002, pet. ref’d).  In that case,
Purchase was found guilty of felony theft. 
At the hearing on the motion for new trial, Purchase’s psychiatrist
testified that Purchase had been previously diagnosed with adjustment disorder
with depressed mood and anxiety symptoms and that Purchase was taking
prescribed antidepressants for the condition. 
Id. at 699.  Purchase testified that he was not taking his
medication during the trial.  Id. 
Purchase’s doctor testified that failure to take the medication would
have affected Purchase’s mental state and his ability to communicate with his
attorney.  Id. at 699–700.  Purchase’s
trial attorney testified that he did not have problems consulting with Purchase
during the trial and he never believed Purchase was incompetent to stand trial.  Id.
at 700.

In the opinion, we noted that there was no evidence that
Purchase’s attorney knew of any factors that might have prompted further
investigation into appellant’s competency. 
Id.  Instead, Purchase appeared competent and his
attorney was not informed that he was on medication or under a psychiatrist’s
care.  Id.  We held that Purchase
failed to establish that he had received ineffective assistance of
counsel.  See id. at 701.

In this case, there is no evidence that there were any
indicators that would suggest that appellant’s mental history would be relevant
to the case.  Foote stated that she did
not know that appellant might suffer from a mental impairment and appellant
stated that Foote did not ask him about his mental history.  There is no indication that appellant or
anyone else was aware at that time that appellant might have a mental
impairment.  Nothing in the record shows
that, prior to appellant’s post-trial diagnosis, appellant had ever been
diagnosed with any mental impairment or was aware of it himself.  Accordingly, even if we were to accept as
true appellant’s statement that Foote never asked him about his mental history,
there is nothing to suggest that this would have been a fruitful inquiry.

Appellant argues that even if he had told Foote that no
evidence existed to support a claim that he was suffering from a mental
impairment, Foote still had a duty to conduct an investigation to determine
whether this evidence existed.  This is
too broad a statement of Foote’s duty. 
An attorney is not allowed to rely exclusively on the client’s version
of events without performing some independent investigation.  See,
e.g., Ex parte Ewing, 570 S.W.2d
941, 947 (Tex. Crim. App. 1978).  On the
other hand:

The reasonableness of counsel’s actions may be determined
or substantially influenced by the defendant’s own statements or actions.  Counsel’s actions are usually based, quite
properly, on informed strategic choices made by the defendant and on
information supplied by the defendant. 
In particular, what investigation decisions are reasonable depends
critically on such information . . . .  And when a defendant has given counsel reason
to believe that pursuing certain investigations would be fruitless or even
harmful, counsel’s failure to pursue those investigations may not later be
challenged as unreasonable.

Strickland,
466 U.S. at 691, 104 S. Ct. at 2065.  As
we have already stated, the only evidence presented is that Foote did not
uncover appellant’s alleged mental impairment in the course of her
investigation and that appellant never told Foote about his mental health
history or his history of sustaining closed head injuries.  There is no evidence that Foote did not
perform any investigation.

Furthermore, assuming without deciding that appellant has
the mental impairment diagnosed by Dr. Axelrad and Dr. Pollock, there is no
evidence that appellant exhibited the characteristics of the impairment in
front of Foote or that appellant’s description of the events relevant to the
assault would have suggested a mental impairment to Foote.  

Dr. Axelrad asserted in his affidavit that appellant
testified in both the guilt-innocence and punishment phases of trial that he
had no memory of being involved in the commission of the aggravated
assault.  Appellant makes a similar
assertion in his brief.  We disagree,
however, with this characterization of appellant’s testimony.

Appellant testified at trial about the details of the
events on the night in question.  While
appellant testified that he could not remember certain specific details about
the night due to being “out of it” after getting beat up in the bar, he never
testified that he could not remember significant portions of any part of the
night.  In fact, he provided details of
what he remembered from the moment he was at the bar to when he went to
bed.  Instead of testifying that he did
not remember attacking Rowland, he repeatedly asserted that he did not attack
Rowland.  Appellant further clarified
that he was not “trying to hide behind intoxication or a faulty memory” and
that there was no possible way that he committed the assault against Rowland.

Likewise, in his statement to the police four days after
the incident, appellant said he was jumped at the bar but insisted that he did
not talk to any girl other than his girlfriend. 
He also said that they drove his girlfriend’s Toyota to the bar and back
to his place and that his BMW was at home the entire time.  He told the officer that they drove straight
to his apartment.  He admitted that his
BMW was in the shop for repairs but said it was because some kids had thrown something
at the car around dusk the previous Saturday. 
He identified a movie that was playing on a television station when he
got home.  Finally, he said he showered
and went to bed.

Additionally, Carroll’s and Matala’s testimony
corroborated the testimony given by appellant. 
Their testimony specifically excluded any possibility that appellant
harassed Rowland at the bar or assaulted her afterwards.  Accordingly, Foote would not have had reason
to believe, based on appellant’s, Carroll’s and Matala’s recounting of the
events in question, that appellant was exhibiting any mental impairment that
night.

Appellant argues in his brief that there were two
indicators that should have suggested to Foote that appellant might suffer from
a mental impairment: (1) “she was obviously on notice that [appellant] was a
long-time kick-boxer” and (2) “there was nothing in his past to indicate the
random violence presented by the facts of this case.”  Addressing the second point first, we fail to
see how the lack of a history of violence would suggest a mental impairment
while a history of violence would not. 
To the degree that appellant argues that any act of violence—whether a
solitary act or one in a history of such acts—automatically raises a suggestion
of a mental impairment precluding the offender from forming the requisite
mental state, we decline to create such a rule.

Appellant testified at the punishment hearing that he held
the full contact kickboxing title for Southwest Texas, Texas, and the United
States.  He also testified that he
competed for the world title in 2000, but lost. 
Assuming without deciding that we can impute Foote with this knowledge
prior to trial,[2] we cannot conclude that
any failure by Foote to do further investigation based on this information
would constitute ineffective assistance of counsel.  In Purchase
we held that “we will not now begin creating a list of mandatory questions that
must be asked of defendants regardless of the circumstances surrounding the legal
representation.”  84 S.W.3d at 701.  We decline to hold that failure to
investigate whether a person trained and competing in martial arts is suffering
from a mental impairment constitutes conduct “so outrageous that no competent
attorney would have engaged in it.”  Shanklin v. State, 190 S.W.3d 154, 160
(Tex. App.—Houston [1st Dist.] 2005), pet.
dism’d improvidently granted, 211 S.W.3d 315 (Tex. Crim. App. 2007).

Appellant also compares his situation to the facts in Gonzales.  In Gonzales,
the defendant was convicted of capital murder. 
204 S.W.3d at 393.  In a writ of
habeas corpus proceeding, Gonzales sought to establish that his trial counsel
was ineffective for failing to uncover the extensive physical and sexual abuse
he suffered as a child.  Id. at 394.  It was established that the abuse he
experienced caused him to suffer from post-traumatic stress disorder.  Id.  It was also established that, while
Gonzales’s attorney talked to Gonzales, his mother, and his sister, the
attorney did not ask about any specific topics. 
Id.  Instead, the interviews were only global in
nature.  Gonzales’ attorney later stated
that he should have “at least inquired” into Gonzales’ background and that it
was a mistake on his part not to do so.  Id. at 395.  The Court of Criminal Appeals agreed, holding
that, considering Gonzales’s attorney’s constitutional and statutory obligation
to present mitigating evidence during the punishment phase of a capital murder
trial, the attorney was expected to have inquired whether Gonzales has been
abused as a child.  Id. at 397.

We believe a number of factors distinguish Gonzales from this case.  First, it was established that Gonzales’s
attorney only asked Gonzales, his mother, and his sister global questions,
without asking about any specific topics. 
Id. at 394.  Second, it was established that this
information was readily available to the attorney from the people he already
had access to.  Id.  Third, the Court of
Criminal Appeals emphasized that its holding concerned capital murder cases
specifically.  Id. at 397 (holding “[w]e think that, at the time of the
applicant’s trial, an objective standard of reasonable performance for defense
counsel in a capital case would have
required counsel to inquire whether the defendant had been abused as a child”)
(emphasis added).  None of these critical
factors are present in this case.

Because we do not know the extent of the actual
investigation performed by Foote and must follow the strong presumption that
her investigation was reasonable, because nothing in the record suggests that
Foote should have been aware that appellant ever suffered from a mental
impairment, and because nothing in the record shows that an investigation into
appellant’s mental history at that time would have suggested that a neuropsychological
evaluation would be necessary or useful, we hold that the trial court did not
abuse its discretion in overruling appellant’s motion for new trial based on a
claim of ineffective assistance of counsel.

We overrule appellant’s two points of error.

                                                                                                                                                                   
Conclusion

We affirm the judgment of the trial court.

 

                                                                   Laura
Carter Higley

                                                                   Justice


 

Panel consists of Justices Jennings, Higley, and Brown.

Do not publish.   Tex. R.
App. P. 47.2(b).











[1]           See Tex. Penal Code Ann. §§ 22.01, .02
(Vernon Supp. 2010).





[2]           Appellant volunteered this information upon being asked by
Foote whether he did any volunteer work with churches.