**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 25, 2009

Charles R. Fulbruge III
Clerk

No. 06-70035

DUANE EDWARD BUCK

Petitioner-Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

Respondent-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:04-CV-3965

Before SMITH, WIENER, and OWEN, Circuit Judges.

PER CURIAM:[*]

Petitioner-Appellant Duane Edward Buck was convicted of capital murder in Texas and sentenced to death. The district court denied Buck's petition for federal habeas corpus relief and declined to issue a Certificate of Appealability ("COA"). Buck now seeks a COA from us on a single issue: Was he deprived of due process or equal protection by the prosecution's reference to testimony from

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Buck's own penalty-phase expert witness, who stated that, after considering several factors — including race — he had determined that Buck would not likely pose any future danger to society if he were incarcerated. Agreeing with Respondent-Appellee Rick Thaler ("the Director") that Buck's claim is procedurally barred and that, even if it were not, it lacks merit, we decline to issue a COA.

## I. FACTS AND PROCEEDINGS

### A. Background

Early one morning in July 1995, Buck's ex-girlfriend, Debra Gardner, and several of her friends, including Kenneth Butler, his brother, Harold Ebnezer, and Buck's sister, Phyllis Taylor, gathered at Gardner's house after having spent the previous night out playing pool. Buck and Gardner had ended their relationship about one week earlier. At some point that morning, Buck arrived at the residence, banged on the front door, and kicked it open, after which he argued loudly with Gardner and struck her before retrieving some of his possessions and leaving.

Several hours later, Buck returned with a rifle and a shotgun. After forcing the front door open, Buck fired at — but missed — Ebnezer, who immediately fled the house through the back door. Buck then approached Taylor, pressed the muzzle of the rifle directly against her chest, and fired. Taylor fell to the ground but survived her injuries. As she lay on the ground, Taylor heard several more gunshots coming from the area of the bedrooms. When Taylor was able to stand and make her way through the house, she discovered Butler's body slumped over and bleeding in the hallway.

After hearing the first gunshots, Devon Green, Gardner's then-11-year-old son who had been sleeping in the back bedroom, hid in the hallway closet. From his hiding place, Green listened as Buck confronted Butler in the hallway and accused him of sleeping with Buck's "wife." Gunshots followed. Both Green and

his teenage sister, Shennel Gardner, then ran outside, where they witnessed Buck shoot their mother as she attempted to flee in the street.

Buck placed both guns into the trunk of his car, which was parked outside Gardner's residence, and attempted to start the vehicle. When his car did not start, Buck began walking away from the residence. Police arrived just as he was leaving, and both Green and Ebnezer identified him as the shooter. Police then took Buck into custody and recovered a shotgun and a .22 caliber rifle from the trunk of his car. Both Gardner and Butler died from their gunshot wounds.

## B. Trial

A Harris County jury convicted Buck on charges of capital murder for the shooting deaths of Gardner and Butler. During the penalty phase of Buck's trial, the prosecution presented evidence of his prior convictions for delivery of cocaine and unlawful possession of a weapon. The prosecution also called several witnesses who portrayed Buck as a violent and remorseless criminal. For example, Vivian Jackson, another of Buck's ex-girlfriends, testified that Buck had physically abused her on several occasions and had once threatened her with a gun. In addition, one of the police officers who had been present during Buck's instant arrest testified that Buck had laughed both during and after the arrest. The officer recalled telling Buck that he did not find the situation funny, to which Buck, still laughing, responded, "[t]he bitch deserved what she got."

In mitigation, Buck presented evidence that he is a peaceful, non-violent person; that his mother died when he was 12 years old; that he worked as an auto mechanic; and that, while he was growing up, his father had served several jail sentences for non-violent felonies. Buck called Dr. Walter Quijano, a clinical psychologist, as an expert witness to testify on the likelihood of Buck's future dangerousness.[1] On direct examination, Dr. Quijano testified that he had

---

[1] Buck also called Dr. Patrick Lawrence, another psychologist, as an expert witness to testify on future dangerousness. Both Dr. Quijano and Dr. Lawrence testified that various

considered several statistical factors when evaluating Buck's potential for future dangerousness, including but not limited to age, sex, race, social economics, history of violence, and history of substance abuse. Regarding race, Dr. Quijano stated: "It's a sad commentary that minorities, Hispanics and black people, are over represented in the criminal justice system."

Dr. Quijano also testified that Buck suffered from dependent personality disorder, which is characterized by an unhealthy reluctance to let go of past relationships, even to the point of violent or destructive behavior. According to Dr. Quijano, however, Buck was unlikely to commit future acts of violence because would be unable to develop similar dependent relationships in jail. Basing his opinion on a combination of statistical, environmental, and clinical factors listed in his expert report, Dr. Quijano concluded that Buck would not likely pose any future danger to society if he were incarcerated.

On cross-examination, the prosecutor questioned Dr. Quijano regarding the several factors that he had mentioned during direct examination. At one point, the prosecutor — without objection from Buck's defense counsel — asked Dr. Quijano about his consideration of both race and sex as relevant factors in his future-dangerousness analysis, which led to the following exchange:

Q: You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons; is that correct?

A: Yes.

During closing arguments, Buck's defense counsel recalled for the jury Dr. Quijano's earlier testimony that there was "a very low probability that [Buck] would ever commit an act of violence." In rebuttal, the prosecution also

statistical factors indicated that Buck was a good candidate for a life sentence, as he would not pose a continuing threat to society if he were incarcerated.

referenced Dr. Quijano's testimony, stating — again without objection from defense counsel — that Dr. Quijano, "who had a lot of experience in the Texas Department of Corrections, . . . told you that there was a probability that [Buck] would commit future acts of violence." The prosecution made no reference whatsoever to Buck's race (African-American) or to Dr. Quijano's use of race as a statistical factor for determining future dangerousness.

The jury concluded that Buck is a future danger to society and that there was insufficient mitigating evidence to justify a sentence of life imprisonment. After the trial court sentenced Buck to death by lethal injection, the Texas Court of Criminal Appeals ("TCCA") affirmed Buck's conviction and death sentence.

## C.    Habeas Proceedings

Buck sequentially filed two state habeas petitions with the trial court. After reviewing both petitions, the trial court recommended that Buck's first petition be denied on the merits and that his second petition be directed to the TCCA as a successive writ application. Adopting the trial court's findings and recommendations, the TCCA denied Buck's earlier habeas petition on the merits and dismissed the later petition as an abuse of the writ.

Following the TCCA's ruling, Buck timely filed a petition for a writ of habeas corpus with the federal district court. In his federal habeas petition, Buck alleged several bases for relief, including (1) the trial court's refusal to inform the jury of the law concerning Buck's parole eligibility if he were sentenced to life imprisonment; (2) ineffective assistance of counsel; (3) the prosecution's references to Dr. Quijano's testimony citing race as a factor for determining future dangerousness; and (4) the constitutionality of the Texas death penalty statute. Concluding that Buck had failed to show that reasonable jurists could debate the correctness of the trial court's rulings, the district court granted the Director's motion for summary judgment and *sua sponte* declined to issue a COA.

5

Pursuant to 28 U.S.C. § 2253(c)(1), Buck timely filed an application for a COA with us. In his application, Buck seeks a COA on only a single issue, *viz.*, whether he was deprived of due process or equal protection by the prosecution's reference to Dr. Quijano's testimony citing race as a future-dangerousness factor.[2]

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act ("AEDPA") requires a petitioner to obtain a COA to appeal the district court's denial of his habeas petition.[3] We may only grant a COA if the petitioner makes "a substantial showing of the denial of a constitutional right."[4] "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[5] In making this determination, we conduct a "threshold inquiry" that involves "an overview of the claims in the habeas petition and a general assessment of their merits" but "does not require full consideration of the factual or legal bases

---

[2] Buck framed the sole basis for his application seeking a COA as follows:

Whether Appellant's rights protected by the due process and equal protection clauses of the Fifth Amendment and the Eighth Amendment of the United States Constitution were abrogated by the presentation of expert testimony during the penalty phase of his trial which was embraced by [the state's] jury argument that allowed for consideration of his race as an aggravating factor in the jury's life or death decision.

[3] 28 U.S.C. § 2253(c)(1).

[4] *Id.* § 2253(c)(2).

[5] *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

6

adduced in support of the claims."[6]  In death-penalty cases, we resolve in favor of the petitioner any doubts whether a COA should issue.[7]

### III.  ANALYSIS

**A.     Procedural Bar**

The Director contends that Buck is procedurally barred from seeking a COA on the prosecution's reference to Dr. Quijano's testimony because Buck failed to exhaust the issue in the state court proceedings.  Buck concedes that he did not raise the issue of Dr. Quijano's testimony until he filed his second habeas petition, which the TCCA dismissed as an abuse of the writ.  After determining that Buck had failed to show either sufficient cause for delay or manifest injustice resulting from it, the district court concluded that Buck was procedurally barred from raising the issue in his federal habeas petition.

When a district court's denial of habeas relief is premised on procedural grounds, we will issue a COA only if the petitioner can show "*not only* that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, *but also* that they would find it debatable whether the district court was correct in its procedural ruling."[8]  The petitioner "must make a substantial showing that the district court's procedural ruling was incorrect before we can consider the merits" of the underlying claim.[9]

---

[6] *Id.* at 336.

[7] *Id.* at 460.

[8] *See Beazley v. Johnson*, 242 F.3d 248, 263 (5th Cir. 2001) (internal quotation marks and citation omitted) (emphasis in original).

[9] *See Turner v. Quarterman*, 481 F.3d 292, 301 (5th Cir. 2007).

Under 28 U.S.C. § 2254(b)(1)(A), a federal court may not grant habeas relief unless "the applicant has exhausted the remedies available in the courts of the State."[10] As we have previously explained,

> [t]he requirements of the exhaustion concept are simple: An applicant must fairly apprise the highest court of his state of the federal rights which were allegedly violated. Further, the applicant must present his claims in a procedurally correct manner. If, for whatever reason, an applicant bypasses the appellate processes of his state — whether through procedural default or otherwise — he will *not* be deemed to have met the exhaustion requirement absent a showing of one of two particulars. He must either demonstrate cause and prejudice *or* show that the failure to consider his claims will result in a fundamental miscarriage of justice.[11]

To demonstrate "good cause" for a procedural default, the petitioner must show either that his counsel was ineffective or that some objective, external factor impeded his counsel's efforts to comply with the procedural rule.[12] Alternatively, the petitioner may show "a fundamental miscarriage of justice" by establishing his actual innocence, either of the crime of which he was convicted or of the death penalty.[13] "Actual innocence of the death penalty" requires a showing "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."[14]

---

[10] 28 U.S.C. § 2254(b)(1)(A).

[11] *Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993) (emphasis added) (internal quotation marks and citation omitted).

[12] *See Murray v. Carrier*, 477 U.S. 478, 488 (1986).

[13] *See Schlup v. Delo*, 513 U.S. 298, 324 (1995) (noting that "the fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case"); *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992)

[14] *Sawyer*, 505 U.S. at 336.

Except in specific, narrowly defined circumstances that are not applicable in the instant case, Texas prohibits petitioners from filing successive petitions for writs of habeas corpus.[15] The TCCA has previously explained that, "if an applicant for a subsequent writ of habeas corpus raises issues that existed at the time of his first writ," then, absent a showing of good cause, the successive petition should be dismissed as an abuse of the writ, both "as a general rule, and as a matter of policy."[16] Noting that the TCCA has strictly and regularly applied Texas's abuse-of-the-writ doctrine, we have previously instructed that the TCCA's dismissal of a successive habeas petition as an abuse of the writ generally creates a procedural bar, precluding our review of issues first raised

---

[15] *See* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 5 (Vernon 2009). For example, the Texas Code of Criminal Procedure provides that:

> If a subsequent application for a writ of habeas corpus is filed after filing an initial application a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no reasonable juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury . . . .

*Id.* If a trial court receives a subsequent habeas petition, the Texas Code of Criminal Procedure directs the court to send a copy of the petition to the TCCA, which, on receiving such a petition, "shall issue an order dismissing the application as an abuse of the writ . . . ." *Id.* § 5(c).

[16] *See Ex Parte Barber*, 879 S.W.2d 889, 892, n. 1 (Tex. Cr. App. 1994).

in the dismissed petition.[17] Given Texas's clear jurisprudence on this point, we conclude that reasonable jurists could not debate the correctness of the district court's ruling that Buck is procedurally barred from raising his claim regarding the prosecutor's comments on Dr. Quijano's testimony in a federal habeas petition.[18]

Further, Buck has not asserted anything which even suggests that his claim falls within one of the exceptions to the exhaustion requirement. Although Buck was unquestionably aware of Dr. Quijano's testimony when he filed his first application for a writ, he has not proffered any good cause for his failure to raise the issue at that time. Further, he has not demonstrated that failure to consider the merits of his claim now would result in a fundamental miscarriage of justice. Thus, Buck cannot establish actual innocence of his crime and has failed to show that he would not have been eligible for the death penalty absent the prosecution's reference to Dr. Quijano's testimony.

Citing a line of cases in which Texas has conceded error and waived procedural default after the *prosecution* had introduced Dr. Quijano as an expert witness during the penalty phase, Buck contends that notions of "intra-court comity" compel us to conclude that the State must also waive procedural default in the instant case.[19] Buck's case, however, differs markedly from, e.g., *Saldano v. Roach*, in which the prosecution introduced Dr. Quijano as an expert witness and then proceeded to question him as to how the defendant's race might serve

---

[17] *See Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).

[18] *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (recognizing the "important interest in finality served by state procedural rules, and the significant harm to the States that results from the failure of federal courts to respect them").

[19] *See Saldano v. Roach*, 363 F.3d 545 (5th Cir. 2004); *Alba v. Johnson*, No. 00-40194, 232 F.3d 208, 2000 WL 1272983 (5th Cir. Aug. 21, 2000) (per curiam) (unpublished opinion); *Broxton v. Johnson*, No. H-00-CV-1034 (S.D. Tex. Mar. 28, 2001) (unpublished opinion); *Blue v. Johnson*, No. H-99-0350 (S.D. Tex. Oct. 2, 2000) (unpublished opinion); *Garcia v. Johnson*, No. 99-CV-00134 (E.D. Tex. Sept. 7, 2000) (unpublished opinion).

as a predictor of future dangerousness.[20] In *Saldano*, the State conceded its error and waived any procedural bar that otherwise might have precluded our review of the defendant's claim on the merits. Here, in contrast, the State has not conceded any error or waived any procedural bar.[21] Rather, the State has consistently maintained that it did not violate Buck's constitutional rights merely by questioning Buck's own expert witness — without objection from Buck — on the very same issues first discussed by that witness during direct examination by the defense, a classic example of the defense "opening the door" for the prosecutor to pursue the subject. Because Buck's characterization of "intra-court comity" finds no support in our precedent, we decline to apply here concessions made by the State in different cases with different facts. Such a broad expansion of a party's case-specific concession would not only contravene our precedent, but would also discourage the State from conceding error when it seeks to correct its own mistakes — both of which are clearly undesirable results.[22]

We are confident of the correctness of the district court's procedural ruling, and we conclude that Buck is procedurally barred from seeking a COA on the issue of the prosecution's exploring of Dr. Quijano's testimony on race as a factor in the future-dangerousness calculus.[23]

---

[20] *Saldano*, 363 F.3d at 549.

[21] Of course, in *Saldano*, we did not have occasion to review the petitioner's claim on the merits, because, after confessing error, the State did not appeal the district court's ruling in favor of the petitioner; rather, our jurisdiction was invoked because the Collin County district attorney had appealed the district court's denial of his motion to intervene. *Id.* at 556.

[22] *See Deters v. Collins*, 985 F.2d 789, 795 (5th Cir. 1993) (noting that the exhaustion requirement "is excused only in those rare cases where exceptional circumstances of peculiar urgency mandate federal court interference" (internal quotation marks and citation omitted)).

[23] We also note, without deciding, that Buck's claim would likely be procedurally barred even if he *had* included it in his first application for a writ of habeas corpus. As stated above, defense counsel never objected to the prosecution's terse reference to race — in fact, it was

**B.    Merits**

Even assuming *arguendo* that the correctness of the district court's procedural ruling were subject to debate among reasonable jurists, we are satisfied that Buck's claim would fail on the merits.  It was Buck, not the prosecution, who introduced Dr. Quijano as an expert witness and then solicited testimony from him regarding the use of race as one of several statistical factors for predicting future dangerousness.  Buck cannot now claim surprise at the opinions that Dr. Quijano expressed.  Indeed, in the punishment phase of the trial, it was Buck's defense counsel who argued for the admission of Dr. Quijano's expert report into evidence, despite language in the report suggesting that Buck's race is one factor that might argue in favor of a finding of future dangerousness.   Buck and his counsel presumably made this strategic determination because they believed that the potential benefit of Dr. Quijano's ultimate conclusion — that Buck was not likely to pose any future danger to society if he were incarcerated — outweighed any risk of exposing the jury to Dr. Quijano's less favorable opinions.  Despite Buck's having opened the door to this testimony during his direct examination, the prosecution referenced the race factor only once during cross-examination, and never mentioned it at all during closing arguments.  Even if we were to consider Buck's petition on the merits, we would conclude that it fails to demonstrate a substantial showing of the deprivation of a constitutional right.

---

defense counsel who introduced Dr. Quijano as an expert witness and then proceeded to solicit the testimony at issue.  As we have previously explained, Texas's contemporaneous objection rule — which requires that errors be properly preserved by an objection — serves as "an adequate procedural bar," preventing our review of issues that were deemed defaulted for lack of any contemporaneous objection by defense counsel. *See Dowthitt v. Johnson*, 230 F.3d 733, 752 (5th Cir. 2000).

## IV. CONCLUSION

We decline to issue a COA on Buck's claim because he is procedurally barred from seeking federal habeas relief for issues that he first raised in his second state petition, which the TCCA dismissed as an abuse of the writ. Alternatively, even if we were to consider the merits of Buck's claim, we would conclude that it fails to make a substantial showing of the denial of a constitutional right.

PETITION FOR A CERTIFICATE OF APPEALABILITY DENIED.