# SUPREME COURT OF THE UNITED STATES

## DUANE EDWARD BUCK *v.* RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 11–6391.   Decided November 7, 2011

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, dissenting from denial of certiorari.

Today the Court denies review of a death sentence marred by racial overtones and a record compromised by misleading remarks and omissions made by the State of Texas in the federal habeas proceedings below.  Because our criminal justice system should not tolerate either circumstance—especially in a capital case—I dissent and vote to grant the petition.

Duane E. Buck was convicted of capital murder in a Texas state court.  During the penalty phase of Buck's trial, the defense called psychologist Walter Quijano as a witness.  The defense sought Quijano's opinion as to whether Buck would pose a continuing threat to society—a fact that the jury was required to find in order to sentence Buck to death.  Quijano testified that there were several "statistical factors we know to predict future dangerousness," and listed a defendant's past crimes, age, sex, race, socioeconomic status, employment stability, and substance abuse history.  28 Tr. 110–111 (May 6, 1997).  As to race, Quijano said: "Race.  It's a sad commentary that minorities, Hispanics and black people, are over represented in the Criminal Justice System."  *Id.,* at 111.  The defense then asked Quijano to "talk about environmental factors if [Buck were] incarcerated in prison."  *Id.,* at 111–112.  Quijano explained that, for example, Buck "has no assaul-

tive incidents either at TDC or in jail," and that "that's a good sign that this person is controllable within a jail or prison setting." *Id.,* at 115. He also explained that Buck's "victim [was] not random" because "there [was] a pre-existing relationship," and that this reduced the probability that Buck would pose a future danger. *Id.,* at 112. Ultimately, when the defense asked Quijano whether Buck was likely to commit violent criminal acts if he were sentenced to life imprisonment, Quijano replied, "The probability of that happening in prison would be low." *Id.,* at 115. The defense also offered into evidence, over the prosecutor's objection, a report containing Quijano's psychological evaluation of Buck, which substantially mirrored Quijano's trial testimony.[1]

On cross-examination, the prosecutor began by asking Quijano about the financial compensation he received in return for his time and the methods he used to examine Buck. The prosecutor then said that she would "like to ask [Quijano] some questions from [his] report." *Id.,* at 155. After inquiring about the statistical factors of past crimes and age and how they might indicate future dangerousness in Buck's case, the prosecutor said: "You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons; is that correct?" *Id.,* at 160. Quijano answered, "Yes." *Ibid.* After additional cross-examination and testimony from a subsequent witness, the prosecutor argued to the jury in summation that

---

[1] The report listed the following statistical factors relevant to the question whether Buck would pose a continuing threat to society: past crimes, age, sex, race, socioeconomics, employment stability, and substance abuse. As to race, the report stated: "4. **Race.** Black: Increased probability. There is an over-representation of Blacks among the violent offenders." Defense Exh. 1 in No. 699684 (208th Jud. Dist., Harris Cty., Tex.), p. 7.

Quijano "told you that there was a probability that [Buck] would commit future acts of violence." *Id.,* at 260. The jury returned a verdict of death.

This was not the first time that Quijano had testified in a Texas capital case, or in which the prosecution asked him questions regarding the relationship between race and future dangerousness. State prosecutors had elicited comparable testimony from Quijano in several other cases. In four of them, the prosecution called Quijano as a witness. See *Gonzales* v. *Cockrell*, Civ. Action No. 99–72 (WD Tex., Dec. 19, 2002); *Broxton* v. *Johnson*, Civ. Action No. 00–1034 (SD Tex., Mar. 28, 2001); *Garcia* v. *Johnson*, Civ. Action No. 99–134 (ED Tex., Sept. 7, 2000); *Saldano* v. *Texas*, 530 U. S. 1212 (2000). In two, the defense called Quijano, but the prosecution was the first to elicit race-related testimony from him. See *Alba* v. *Johnson*, 232 F. 3d 208 (CA5 2000) (Table); *Blue* v. *Johnson*, Civ. Action No. 99–0350 (SD Tex., Sept. 29, 2000). In each case, as in Buck's, however, the salient fact was that the prosecution invited the jury to consider race as a factor in sentencing. And in each case, the defendant was sentenced to death.

When one of those defendants, Victor Hugo Saldano, petitioned for this Court's review, the State of Texas confessed error. It acknowledged that "the use of race in Saldano's sentencing seriously undermined the fairness, integrity, or public reputation of the judicial process." Response to Pet. for Cert. in *Saldano* v. *Texas*, O. T. 1999, No. 99–8119, p. 7. The State continued, "[T]he infusion of race as a factor for the jury to weigh in making its determination violated [Saldano's] constitutional right to be sentenced without regard to the color of his skin." *Id.,* at 8. We granted Saldano's petition, vacated the judgment, and remanded. *Saldano* v. *Texas*, 530 U. S. 1212.

Shortly afterwards, the then-attorney general of Texas announced publicly that he had identified six cases that were "similar to that of Victor Hugo Saldano" in that

"testimony was offered by Dr. Quijano that race should be a factor for the jury to consider" in making its sentencing determination. Record in No. 4:04–cv–03965 (SD Tex.), Doc. 27–5, p. 30 (hereinafter Record) (internal quotation marks omitted). These were the five cases listed above (besides *Saldano*), as well as Buck's. The attorney general declared that "it is inappropriate to allow race to be considered as a factor in our criminal justice system." *Ibid.* (internal quotation marks omitted). Accordingly, in five of the six cases the attorney general identified, the State confessed error and did not raise procedural defenses to the defendants' federal habeas petitions. Five of the six defendants were thus resentenced, each to death.

Only in Buck's case, the last of the six cases to reach federal habeas review, did the State assert a procedural bar. Why the State chose to treat Buck differently from each of the other defendants has not always been clear. As the Court of Appeals for the Fifth Circuit recognized in the decision that is the subject of this petition, "We are provided with no explanation for why the State declined to act consistently with its Attorney General's public announcement with respect to petitioner Buck." No. 11–70025, 2011 WL 4067164, *8, n. 41 (Sept. 14, 2011).

What we do know is that the State justified its assertion of a procedural defense in the District Court based on statements and omissions that were misleading. The State found itself "compelled" to treat Buck's case differently from Saldano's because of a "critical distinction": "Buck himself, not the State[,] offered Dr. Quijano's testimony into evidence." Record, Doc. 6, at 17. The State created the unmistakable impression that Buck's case differed from the others in that only Buck called Quijano as a witness. The State asserted, "[T]he Director is obviously aware of the prior confessions of error in other federal habeas corpus cases involving similar testimony by Dr. Quijano. However, this case is *not Saldano*. In Sal-

dano's case Dr. Quijano *testified for the State.*" *Id.,* at 20 (citation omitted; emphasis in original); see also *ibid.* ("Therefore, because it was Buck who called Dr. Quijano to testify and derived the benefit of Dr. Quijano's overall opinion that Buck was unlikely to be a future danger despite the existence of some negative factors, this case does not represent the odious error contained in the *Saldano* cases"). This was obviously not accurate. Like Buck, the defendants in both *Blue* and *Alba* called Quijano to the stand. But on the ground that only Buck had called Quijano as a witness, the State urged the District Court that "the former actions of the Director [in the other five cases] are not applicable and should not be considered in deciding this case." Record, Doc. 6, at 20.[2] The District Court applied the procedural bar raised by the State and dismissed Buck's petition.

Buck later brought the State's misstatements to light in a motion to reopen the judgment under Rule 60 of the Federal Rules of Civil Procedure. In response, the State erroneously identified *Alba* as a case in which the *prosecution* had called Quijano to the stand, and omitted any mention of *Blue*. After the District Court denied Buck's Rule 60 motion, Buck highlighted these errors in a motion under Rule 59(e) to alter or amend the judgment, which the District Court also denied. The Fifth Circuit denied Buck's application for a certificate of appealability (COA) to review these two judgments.

I believe the Fifth Circuit erred in doing so. To obtain a COA, a petitioner need not "prove, before the issuance of a COA, that some jurists would grant the petition for habeas

---

[2] Perhaps, under a generous reading of the State's briefing, the State meant to convey to the District Court that Buck's case was distinguishable from the others not only because he called Quijano as a witness, but also because he elicited race-related testimony. But that is not what the briefing says. The distinction that the State offered—that Buck alone proffered Quijano as a witness—is incorrect.

corpus." *Miller-El* v. *Cockrell*, 537 U. S. 322, 338 (2003). Instead, a petitioner must show that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.*, at 327. See also 28 U. S. C. §2253(c)(2).

Buck has met this standard. The Rule 60 relief that he sought in the District Court was highly discretionary. *Liljeberg* v. *Health Services Acquisition Corp.*, 486 U. S. 847 (1988). Yet the District Court denied relief based on a record compromised by the State's misleading remarks and omissions. I realize that, in denying Buck's Rule 59(e) motion, the District Court was aware of Buck's arguments that the State had mischaracterized *Alba* and *Blue.* But the District Court lacked other information that might have influenced its decision. Significantly, the District Court could not know that the State would later concede in the Fifth Circuit that it had mischaracterized *Alba.*

Nor, for similar reasons, did the District Court have the opportunity to evaluate the State's subsequent efforts in the Fifth Circuit and this Court to try to distinguish Buck's case from *Alba* and *Blue.* The State argues that although the defendants in those cases each proffered Quijano as a witness, they did not, like Buck, elicit race-related testimony on direct examination; instead, the prosecution first did so on cross-examination.

This distinction is accurate but not necessarily substantial. The context in which Buck's counsel addressed race differed markedly from how the prosecutor used it. On direct examination, Quijano referred to race as part of his overall opinion that Buck would pose a low threat to society were he imprisoned. This is exactly how the State has characterized Quijano's testimony. *E.g.*, Thaler's Reply to Buck's Motion for Relief from Judgment and Motion for Stay of Execution in No. 4:04–cv–03965 (SD Tex.), pp. 15–

16 ("In this case, first on direct examination by the de-
fense, Dr. Quijano merely identified race as one statistical
factor and pointed out that African-Americans were
overrepresented in the criminal justice system; he did not
state a causal relationship, nor did he link this statistic to
Buck as an individual"). Buck did not argue that his race
made him *less* dangerous, and the prosecutor had no need
to revisit the issue. But she did, in a question specifically
designed to persuade the jury that Buck's race made him
*more* dangerous and that, in part on this basis, he should
be sentenced to death.

   The then-attorney general of Texas recognized that "it is
inappropriate to allow race to be considered as a factor in
our criminal justice system." Record, Doc. 27–5, at 30
(internal quotation marks omitted). Whether the District
Court would accord any weight to the State's purported
distinctions between Buck's case and the others is a ques-
tion which that court should decide in the first instance,
based on an unobscured record. Especially in light of the
capital nature of this case and the express recognition by
a Texas attorney general that the relevant testimony
was inappropriately race-charged, Buck has presented
issues that "deserve encouragement to proceed further."
*Miller-El*, 537 U. S., at 327.