**Ex parte Duane Edward BUCK.**

**No. WR–57004–03.**

Court of Criminal Appeals of Texas.

Nov. 20, 2013.

Katherine C. Black, Houston, TX, for Appellant.

Devon Anderson, Assistant District Attorney, Houston, Lisa C. McMinn, State's Attorney, Austin, TX, for the State.

### ORDER

PER CURIAM.

This is a subsequent application for writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071, § 5.

In May 1997, Applicant was convicted of the offense of capital murder. The jury answered the special issues submitted under Article 37.071, TEX. CODE CRIM. PROC., and the trial court, accordingly, set punishment at death. This Court affirmed Applicant's conviction and sentence on direct appeal. *Buck v. State*, No. AP–72,810 (Tex.Crim.App. April 28, 1999). This Court denied relief on Applicant's initial post-conviction application for writ of habeas corpus. *Ex parte Buck*, No. WR–57,004–01 (Tex.Crim.App. October 15, 2003). This Court dismissed Applicant's second post-conviction application for writ of habeas corpus. *Ex parte Buck*, No. WR–57,004–02 (Tex.Crim.App. October 15, 2003). Applicant's instant post-conviction application for writ of habeas corpus was received in this Court on March 28, 2013.

Applicant presents three allegations in the instant application. We have reviewed the application and find that Applicant has failed to satisfy the requirements of Article 11.071, § 5(a). Accordingly, we dismiss the application as an abuse of the writ without considering the merits of the claims.

IT IS SO ORDERED.

ALCALA, J., filed a dissenting statement in which PRICE and JOHNSON, JJ., joined.

ALCALA, J., filed a dissenting statement in which PRICE and JOHNSON, JJ., joined.

I respectfully dissent from the Court's dismissal of applicant's second subsequent application for a writ of habeas corpus. The record in this case reveals a chronicle of inadequate representation at every stage of the proceedings, the integrity of which is further called into question by the admission of racist and inflammatory testimony from an expert witness at the punishment phase. Applicant's initial habeas counsel was so incompetent as to assert not even one arguably legitimate claim in the initial 11.071 application, which was summarily denied by this Court for raising only record-based or frivolous claims. As a result of prior habeas counsel's errors and the combined force of state and federal procedural-default laws, no Court has ever considered the merits of applicant's legitimate claims for post-conviction relief. This cannot be what the Legislature intended when it enacted Article 11.071 to provide capital habeas litigants "one full and fair opportunity to present all [ ] claims in a single, comprehensive post-conviction writ of habeas corpus[.]" *See Ex parte Graves*, 70 S.W.3d 103, 117 (Tex. Crim.App.2002). In the current application, applicant now raises a possibly meritorious claim that his trial counsel was

ineffective for failing to investigate and present readily available mitigating evidence, including evidence that, as a child, he was physically abused by his father and regularly witnessed serious incidents of domestic violence, but this Court declines to adjudicate that claim and instead dismisses this application as subsequent. I would take this opportunity to revisit *Ex parte Graves*, in which this Court held that a claim of ineffective assistance of prior habeas counsel is not cognizable in a capital habeas proceeding and may not serve as a basis to consider a claim raised in a subsequent writ. *See Graves*, 70 S.W.3d at 117–18. I would hold that an applicant for habeas corpus relief under Article 11.071 is statutorily entitled to minimally competent representation by appointed counsel. *See* TEX.CODE CRIM. PROC. art. 11.071, §§ 2(a) (providing for representation by competent counsel); 3(a) (mandating that counsel "shall investigate" factual and legal bases for relief). I would further hold that, when an applicant can demonstrate that initial habeas counsel's performance fell below the minimum standards for representation set forth in Article 11.071, and when an applicant can demonstrate that, as a result of counsel's incompetence, a substantial claim for relief was forfeited, this Court may properly exercise its habeas jurisdiction to consider the merits of the underlying claim. Having concluded that the applicant in this case has made such a showing with respect to his third claim, I would remand this application to the trial court for findings of fact and conclusions of law.

## I. Background and Procedural History

### A. Trial and Appellate Proceedings

Early one morning in the summer of 1995, applicant broke into the home of his ex-girlfriend, Debra Gardner, shot to death a man he believed was sleeping with her, and chased her into the street where he also shot her to death. Applicant also shot at a third adult in the house, who managed to escape without injury, and a fourth adult, his step-sister Phyllis Taylor, who survived a gunshot wound to her chest. The shooting occurred in the presence of Gardner's children.

Applicant was arrested, tried, and ultimately convicted of capital murder in May 1997. At the punishment phase of trial, the State presented evidence to prove that applicant would pose a future danger if given a life sentence. It provided evidence of applicant's prior criminal history, which revealed that applicant had previously been convicted of several non-violent drug and weapons offenses.[1] It also presented character evidence and victim-impact testimony. That evidence included testimony from applicant's former girlfriend, Vivian Jackson, who testified that applicant subjected her to physical abuse during their five-year relationship. Jackson testified that towards the end of the relationship, applicant hit her "almost every day." She testified that applicant, on one occasion, put a gun to her face, and another time "threatened to pour boiling water on [her]." She stated that applicant beat her with objects that included "a belt, a coat hanger, and one time he had a cast on his arm and beat [her] in the head with it." She also stated that, out of fear of applicant, she had never called the police to report the abuse. She further stated that applicant had threatened to physically

---

1. The record indicates that applicant was convicted in 1989 of unlawful carrying of a weapon and failure to identify to a peace officer, both misdemeanor offenses. Also in 1989, applicant was convicted of possession of a controlled substance, for which he received a three-year sentence. In 1990, applicant was convicted of delivery of crack cocaine, for which he received a 10–year sentence.

harm her if she tried to leave the relationship.

The State's evidence also included testimony from an officer who responded to the crime scene. That officer testified that he had stayed with Gardner while she lay injured in the street. He stated that there were three young children observing the scene, one of whom was a three- or four-year-old girl who was crying for her mother. The officer stated that he permitted the little girl to come over to her mother, and that Gardner told her that she loved her and that it was going to be all right. The officer stated that he then took the girl away and Gardner expired.

That same officer described applicant's demeanor following his arrest as being "upbeat and laughing." The officer stated that, upon placing applicant in the patrol car for transport to the police station, applicant was "smiling and laughing." When the officer told him that he did not find the situation funny, applicant responded, "The bitch got what she deserved." The officer also said that applicant told him that "God had already forgiven him before and that he was going to heaven because he was forgiven." The officer said applicant showed no signs of remorse following his arrest.

The defense presented limited mitigating evidence from applicant's pastor, step-mother, father, and one of his sisters, all of whom described applicant as peaceful, non-violent, "nice," and religious. The pastor described applicant as "awful quiet" and "very studious." Applicant's sister Monique Winn described him as a "good brother." Winn told the jury that her and applicant's mother had died in a car accident when applicant was 12 years old, after which their father married Sharon Buck, their step-mother. Winn stated that applicant graduated from high school and had worked as a mechanic, and that she had never known him to be violent. Applicant's step-mother, Sharon Buck, described him during his adolescence and young adulthood as "good" and "normal" and stated that, although she had heard about physical confrontations between him and his former girlfriend Jackson, the situation was not that serious. She acknowledged that applicant's father had a criminal history for felony theft and document-tampering offenses and agreed with defense counsel's description of applicant's father as "a father that got in trouble and did go to jail." Applicant's father described applicant as "a very good son, very humble and nice," and denied that his son had any violent tendencies. Applicant's father acknowledged his own prior convictions for several non-violent felony offenses and further acknowledged that he had spent time in jail during applicant's childhood. Winn, Sharon Buck, and his father all testified that they were "shocked" or "surprised" when they heard that applicant had committed this crime because it was so out of character for him.

In addition to character witnesses, applicant also called two psychologists to testify on the subject of applicant's future dangerousness. One of those psychologists was Dr. Walter Quijano, who testified that the probability of applicant's posing a continuing threat to society was "on the low end of the continuum." On the subject of applicant's personality, Quijano stated that applicant had a dependent personality disorder. He characterized a person with that disorder as being

> selective in their relationships that they develop, but once they develop the relationship, they hang on to it even when the relationship is over. It is difficult for them to disengage and they will do extraordinary things to hang on to the relationship. These individuals can become very extreme in wanting to main-

tain that relationship and sometimes go to the point of thinking if I cannot have you, nobody else can.

He also described applicant as having "poor insight" and an "excessive obsession with the Bible and Jesus." He noted that applicant had an I.Q. of 74, at the "low end of the borderline range," and noted that applicant had a history of substance abuse. Quijano testified that applicant was, relatively speaking, less likely to pose a future danger because "the victim [Gardner] was not random, it's narrow, and there is a pre-existing relationship. It was, for lack of a better term, a husband and wife difficulty that is unlikely to be repeated."[2]

Additionally, Quijano testified that, in making a future-dangerousness prediction for applicant, he had considered applicant's "race" and then added, unprompted, "It's a sad commentary that minorities, Hispanics and black people, are over-represented in the criminal justice system." On cross-examination, the State asked Quijano to further explain his methodology. The prosecutor stated, "You have determined that ... the race factor, black, increases the future dangerousness for various complicated reasons; is that correct?" to which Quijano replied, "Yes."

During closing arguments, defense counsel argued that the State had not met its burden with respect to applicant's future dangerousness. Alternatively, counsel argued that there were sufficient mitigating circumstances to warrant a life sentence because applicant lost his mother when he was eleven years old; his father was arrested "again and again" and went to prison during applicant's childhood; applicant

had previously abused cocaine and alcohol; and the crime was a crime of "passion and jealousy." In response, the State argued that there was a probability that applicant would pose a continuing threat to society based on his criminal history; the "heinous" facts of the crime; applicant's prior abuse of his ex-girlfriend; and the testimony of "the defense's own experts ... who told you that there was a probability that the man would commit future acts of violence." On the topic of mitigation, the prosecutor commented that "everybody has had hardships in life," and argued that applicant's circumstances were insufficient to warrant a life sentence.

The jury agreed with the State, and applicant was sentenced to death. This Court affirmed the conviction and sentence on direct appeal in 1999. *Buck v. State*, No. AP–72,810 (Tex.Crim.App. April 28, 1999) (not designated for publication).

## B. Prior State and Federal Habeas Proceedings

### 1. The Initial and First Subsequent 11.071 Applications

Applicant, represented by appointed counsel Robin Norris, filed an initial application for a writ of habeas corpus in March 1999. In his initial application, applicant alleged four claims for relief, three of which related to the trial court's failure to instruct the jury on parole-eligibility law, and the fourth of which alleged that trial counsel was ineffective for failing to request a lesser-included-offense instruction that would have permitted the jury to convict applicant of murder committed under

---

**2.** The other psychologist, Dr. Lawrence, gave testimony similar to Quijano's. He stated that applicant had a low I.Q.; a history of alcohol and cocaine dependency; and a "dependent personality," which Dr. Lawrence described as "need[ing] other people to help him get along," or "the kind of person who

needed structure and support from other people." He concluded that applicant would be unlikely to commit future criminal acts of violence that would constitute a continuing threat to society because "[h]is was a crime of passion."

the immediate influence of sudden passion arising from an adequate cause. No evidentiary hearing was conducted. In its findings of fact and conclusions of law, the trial court recommended that relief be denied. It concluded that the first three grounds had been "previously raised and rejected on direct appeal," and, therefore, "need not be reconsidered in the instant writ proceeding[.]" *See* Trial Court's Findings of Fact and Conclusions of Law, Cause No. 699684–A (July 23, 2003) (citing *Ex parte Acosta,* 672 S.W.2d 470, 472 (Tex. Crim.App.1984)). The trial court went on to note that, even if it were to reach the merits, applicant's parole-eligibility claims clearly lacked merit under existing law. *See id.* (citing *Canales v. State,* 98 S.W.3d 690, 696 (Tex.Crim.App.2003)); *see also Buck,* No. AP–72,810, slip op. at 8 (rejecting applicant's parole-law claims on direct appeal and noting that this Court had "repeatedly held adversely to appellant's contentions" that jury should have been instructed on parole-eligibility law). The record thus reflects that three of the four claims raised by initial habeas counsel were raised and rejected on direct appeal and, therefore, under the longstanding precedent of this Court, those claims were not cognizable on a post-conviction writ of habeas corpus. *See, e.g., Ex parte Brown,* 205 S.W.3d 538, 546 (Tex.Crim.App.2006) ("[c]laims that have already been raised and rejected are not cognizable" on habeas corpus); *Ex parte Torres,* 943 S.W.2d 469, 475 (Tex.Crim.App.1997) ("Generally, a claim which was previously raised and rejected on direct appeal is not cognizable on habeas corpus.") (citing *Acosta,* 672 S.W.2d at 472).

As to applicant's ineffective-assistance claim, the trial court also quickly disposed of that claim, concluding that applicant had "fail[ed] to demonstrate deficient performance, much less harm." Applicant had complained that his trial attorneys were ineffective for failing to request a lesser-included-offense instruction on murder committed under the immediate influence of sudden passion. The trial court pointed out, however, that that offense was "not statutorily authorized" at the time of applicant's capital murder trial, and thus any request by counsel for a jury instruction on that offense would have been frivolous. The trial court was referring to the fact that the statute defining the offense of "sudden passion" murder was repealed by the Legislature in 1993, two years before applicant committed the murders, and thus it was inapplicable to his case.[3] In short, habeas counsel asserted a wholly frivolous claim that applicant's trial counsel was ineffective for failing to request a jury instruction based on a non-existent provision of the penal code.

In December 2002, while applicant's original application was still pending, habeas counsel Norris filed a subsequent 11.071 application in which he raised two additional claims for relief, including (1) a claim that applicant's death sentence was obtained in violation of the U.S. Constitution because the jury, in arriving at a sentencing decision, had relied upon the testimony of Quijano, who suggested that African–American offenders are more likely to pose a continuing threat to society, and (2) a claim that applicant's trial counsel was constitutionally ineffective for elic-

---

**3.** *See* former TEX. PENAL CODE § 19.04 (West 1994), *repealed by* Act of May 31, 1993, 73rd Leg., R.S., Ch. 900; *see also Wesbrook v. State,* 29 S.W.3d 103, 112–13 & 113 n. 7 (Tex.Crim.App.2000) (noting that, for murders committed after August 31, 1994, sudden pas-
sion was relevant in capital murder trial "only as a mitigating circumstance" at punishment phase; option of convicting defendant of voluntary manslaughter "no longer available" by that time).

iting Quijano's testimony. That application contained no argument as to how it might overcome the statutory bar on subsequent writs, but it did cite an array of federal and state cases for the proposition that race is not relevant to, and may not be considered as an aggravating factor in, a jury's decision whether to assess the death penalty.[4] The trial court identified the application as subsequent and forwarded it to this Court without entering findings of fact and conclusions of law.

This Court disposed of both the initial and first subsequent applications in a single order. *Ex parte Duane Edward Buck*, WR–Nos. 57,004–01 & 57,004–02 (Tex. Crim.App. Oct. 15, 2003) (not designated for publication). It adopted the trial court's findings and conclusions and denied applicant's initial writ application. After determining that applicant's second filing was a subsequent application, the Court dismissed it without considering the merits pursuant to Code of Criminal Procedure Article 11.071, Section 5. *See* TEX.CODE CRIM. PROC. art. 11.071, § 5(a).

## 2. The Federal Litigation

In October 2004, applicant filed a federal petition for writ of habeas corpus, in which he reasserted the same grounds as those he presented in his initial and first subsequent state applications. After it denied all of the claims from applicant's initial application on the merits, the federal district court considered applicant's constitutional claims related to Quijano's testimony. It ruled that those claims were procedurally defaulted because applicant had failed to raise those claims in state court until his first subsequent habeas application, which this Court had dismissed on the basis of Texas's abuse-of-the-writ doctrine. Because this Court declined to consider applicant's Quijano-related claims due to applicant's failure to timely raise them in the initial application, the federal district court ruled that it was barred from reviewing the merits of those claims on federal habeas. *See Buck v. Dretke*, H–04–3965 (S.D.Tex., July 24, 2006) (mem. op.) (citing *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (noting that, under federal procedural-default law, whenever "a state prisoner has defaulted his claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred" unless one of several exceptions is met)); *see also Ibarra v. Thaler*, 691 F.3d 677, 684 (5th Cir.2012) (noting that Article 11.071, Section 5, is an "adequate" state procedural ground for purposes of applying *Coleman*). The federal district court further found that applicant could not meet any of the exceptions to the federal procedural-default doctrine,[5] and it declined to issue a certificate of appealability (COA), which is

---

**4.** Counsel cited, *inter alia, Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Baldwin v. Alabama*, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); and *United States v. Webster*, 162 F.3d 308 (5th Cir.1998). Counsel also acknowledged that this Court had previously held adversely to his position regarding his ineffective-assistance claim, but urged this Court to reconsider its prior holding. *See Garcia v. State*, 57 S.W.3d 436, 438–41 (Tex.Crim.App.2001) (finding no deficient performance in counsel's elicitation of testimony from Dr. Quijano that "blacks and Hispanics" are "overrepresented in the— in the dangerous-so-called dangerous popula-

tion," because counsel's conduct in calling Quijano and eliciting that testimony could have been a product of "sound trial strategy").

**5.** To overcome procedural default in federal court, a federal habeas petitioner must show: (1) cause for the default and prejudice as a result of the alleged violation of federal law, or (2) a resulting "fundamental miscarriage of justice," which, in the death-penalty context, means a showing of "actual innocence of the death penalty." *Coleman v. Thompson*, 501 U.S. 722, 750–51, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see Sawyer v. Whitley*,

a procedural ruling that determines whether a petitioner may appeal the district court's disposition of his claims.[6] Applicant later appealed that procedural ruling and lost. *See Buck v. Thaler,* 345 Fed. Appx. 923, 2009 WL 3054056 (5th Cir. 2009) (upholding denial of COA); *Buck v. Thaler,* 452 Fed.Appx. 423, 2011 WL 4067164 (5th Cir.2011) (denying motion for relief from judgment); *Buck v. Thaler,* —— U.S. ——, 132 S.Ct. 32, 181 L.Ed.2d 411 (2011) (denial of petition for certiorari on federal habeas question). Thus, because applicant's initial habeas counsel failed to include any claims related to Quijano's testimony in his original 11.071 application, no court, state or federal, has ever considered the merits of those claims.[7]

### C. The Present Application

Ten years after this Court's denial of his first two state habeas applications, applicant filed this third application for writ of habeas corpus in March 2013. It alleges three grounds:

1. The [Texas] Attorney General's refusal to concede error was a violation of the Eighth Amendment, procedural and substantive due process, and equal protection, guaranteed by the United States Constitution.

2. Applicant's death sentence is the unconstitutional product of racial discrimination in violation of the equal protection and due process clauses of the United States Constitution.

3. Applicant was denied the effective assistance of counsel at the sentencing

---

505 U.S. 333, 335, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

**6.** *See* 28 U.S.C. § 2253(c)(2) (to obtain COA, federal habeas petitioner must make "substantial showing of the denial of a constitutional right"); *Miller–El v. Cockrell,* 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (noting that, to satisfy "substantial showing" standard, petitioner must demonstrate that "jurists of reason could disagree" with the district court's resolution of his claims).

**7.** Applicant correctly notes in the current application that, prior to the commencement of federal habeas proceedings in his case, the Office of the Texas Attorney General publicly identified his case as one in which a constitutional violation may have occurred as a result of Quijano's testimony. Applicant further notes that, of the six cases publicly identified by the Attorney General's office as possibly being tainted by constitutional error, his is the only case in which the State asserted a procedural-default defense in federal court. In every other case in which claims related to Quijano's testimony were raised, the State waived all procedural defenses and conceded constitutional error. *See Saldano v. Texas,* 530 U.S. 1212, 120 S.Ct. 2214, 147 L.Ed.2d 246 (2000); *Alba v. Johnson,* 232 F.3d 208 (5th Cir.2000); *Gonzales v. Cockrell,* No. 99–

72 (W.D.Tex. Dec. 19, 2002); *Broxton v. Johnson,* No. 00–1034 (S.D.Tex. Mar. 28, 2001); *Blue v. Johnson,* No. 99–0350 (S.D.Tex. Sept. 29, 2000); *Garcia v. Johnson,* No. 99–00134 (E.D.Tex. Sept. 7, 2000). In response to applicant's claims in federal court, the State explained that, in its view, applicant's case was "strikingly different" from the other cases in which it had conceded error because in applicant's case, applicant's own counsel had called Quijano as a witness and elicited the testimony in question. For this reason, the State declined to concede error and instead asserted a procedural-default defense in response to applicant's claims. In the current application, applicant contends that the State's arguments in federal court were misleading because those arguments created the false impression that, of all the cases in which the State had conceded error, only in applicant's case did the defense call Quijano as a witness at trial. In fact, Quijano was called by the defense in two of the other cases in which the State conceded error. *See Alba,* 232 F.3d at 208; *Blue,* No. 99–0350 (S.D.Tex. Sept. 29, 2000). For further history of the federal habeas proceedings in this case, *see Buck v. Thaler,* —— U.S. ——, 132 S.Ct. 32, 181 L.Ed.2d 411 (2011) (mem.op.) (denial of petition for writ of certiorari); *Buck v. Thaler,* 452 Fed.Appx. 423, 2011 WL 4067164 (5th Cir.2011); *Buck v. Thaler,* 345 Fed.Appx. 923, 2009 WL 3054056 (5th Cir.2009).

phase of his capital murder trial, on direct appeal, and in his initial habeas proceedings, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

The trial court determined that this application was subsequent and forwarded it to this Court for a determination as to whether it satisfies the dictates of Code of Criminal Procedure Article 11.071, Section 5. *See* TEX.CODE CRIM. PROC. art. 11.071, § 5(a). A majority of this Court now determines this application to be subsequent and dismisses it without reaching the merits.

## II. This Court Has Jurisdiction to Adjudicate Applicant's Third Claim on the Merits[8]

Applicant asserts that this Court has jurisdiction to address the merits of his third claim under the plain terms of Article 11.071, notwithstanding the fact that this claim appears to be raised in a subsequent application. *See* TEX.CODE CRIM. PROC. art. 11.071, § 5(a) (providing that, if "subsequent application" is filed after an "initial application," this Court may not consider merits unless application meets one of several statutory exceptions). Appli-

cant contends that Article 11.071 mandates that habeas counsel "shall investigate expeditiously" the possible grounds for relief. *See id.* at § 3(a). Applicant further asserts that, because his initial habeas counsel "completely failed to investigate the factual and legal bases for [his] ineffective assistance of trial counsel claims," and instead raised only record-based claims in his initial application, that application was "improperly filed" and thus Section 5 does not preclude a review of his current ineffective-assistance claim on the merits.

I agree with applicant that habeas counsel's failure to investigate the factual and legal bases for relief in this case constituted a violation of Article 11.071, Section 3(a). *See* TEX.CODE CRIM. PROC. art. 11.071, § 3(a). As discussed above, the initial habeas application in this case raised only four claims, three of which were non-cognizable claims that were rejected on direct appeal, and the fourth of which was an ineffective-assistance claim based on a repealed statutory provision. All of the claims were derived solely from the facts in the record. As a result of habeas counsel having raised only non-cognizable or facially frivolous claims in the initial appli-

---

8. I do not address applicant's first and second claims in this dissenting statement because I agree with the Court that those claims are subject to dismissal. Applicant's first claim is procedurally barred because it fails to allege facts that, if established, would constitute a constitutional violation. *See Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex.Crim.App. 2007) (noting that, to overcome bar on subsequent writs based on previously unavailable facts or law, applicant must establish facts that, if true, would amount to constitutional violation). Applicant's assertion that the State committed a constitutional violation by asserting procedural default in federal court in response to his Quijano-related claims does not constitute a valid basis for relief. Although I agree that the State created false hope by publicly identifying applicant's case as similar to other cases in which it had

conceded error, the State's change of course in applicant's case did not infringe on a protected liberty interest. Applicant, as a death-sentenced individual, has no protected liberty interest in having the State respond to his federal post-conviction litigation in any particular manner. *See Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998) (plurality op.); *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981). As to applicant's second claim, I conclude that he has failed to make out a *prima facie* case for discriminatory intent in the prosecution's decision to seek the death penalty in his case. *See, e.g., Cantu v. State*, 939 S.W.2d 627, 649 (Tex.Crim.App.1997); *Bell v. State*, 938 S.W.2d 35, 51 (Tex.Crim.App. 1996).

cation, applicant has been prevented, through an array of state and federal procedural-default rules and bars on successive writs, from receiving a merits adjudication of any legitimate claims for relief. Such an outcome is inconsistent with both the capital habeas statute's plain terms and this Court's previous statements regarding its underlying purpose. *See Ex parte Kerr,* 64 S.W.3d 414, 419 (Tex.Crim. App.2002) (referring to Article 11.071 and stating that the "entire statute is built upon the premise that a death row inmate *does* have one full and fair opportunity to present his constitutional or jurisdictional claims in accordance with the procedures of the statute"). In light of prior habeas counsel's failure to adhere to the plain terms of the habeas statute, I would hold that applicant has been deprived of one full and fair opportunity to present his claims and, therefore, that his initial application for relief was improperly filed. On this basis, I would hold that applicant is entitled to a merits-review of his ineffective-assistance claim.

## A. This Court Should Revisit *Ex parte Graves*

My proposed reading of Article 11.071 is in conflict with certain aspects of this Court's holding in *Ex parte Graves,* 70 S.W.3d at 117–18. I would submit to the Court that the circumstances of this case, viewed in light of recent Supreme Court precedent, warrant a re-examination of the broad holding of *Graves.*

In *Graves,* this Court was asked to consider whether a claim that prior habeas counsel was not "competent" under Article 11.071, Section 2(a), could give rise to a cognizable habeas corpus claim and fulfill the requirements for having this Court consider the merits of a subsequent writ. This Court concluded that such an allegation was not "cognizable" under Article 11.071 because, among other reasons,

there is "no constitutional right to effective assistance of [habeas] counsel." *Id.* at 110 (citing *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)). This Court said it "inevitably followed" from this principle that an applicant may not raise a claim of ineffective assistance of habeas counsel in an 11.071 application because habeas proceedings are reserved for "jurisdictional or fundamental defects and constitutional claims." *Id.* at 107, 111, 116–17 (noting that statutory violations, including violations of Article 11.071, "simply are not cognizable claims on a writ of habeas corpus"). Furthermore, although it acknowledged that Article 11.071 creates a "statutory right to representation" by competent counsel in habeas proceedings, the Court concluded that the right to "competent" counsel extends only to the initial appointment and does not guarantee that counsel will render effective assistance. *Id.* at 113–115. This Court reasoned that, as a practical matter, to hold otherwise would turn Article 11.071 into a "perpetual motion machine" that would permit endless litigation and re-litigation of a death sentence. *Id.* at 114. Such an outcome, the Court determined, was inconsistent with the legislative intent to prevent repetitious litigation in capital cases. *Id.*

For the several reasons discussed below, I respectfully disagree with the Court's holding in *Graves* to the extent that it precludes our consideration of prior habeas counsel's performance in an Article 11.071 proceeding, even in those cases in which counsel has raised only frivolous or non-cognizable grounds for relief in the initial proceeding. I would hold that, although an 11.071 applicant may not be entitled to constitutionally effective assistance of counsel, he is entitled to at least some minimally competent assistance in the investigation and preparation of his

application. *See* Tex.Code Crim. Proc. art. 11.071, §§ 2(a), 3(a). When, as here, the record indicates that counsel has filed only non-cognizable or frivolous claims in an initial application, I would declare that application improperly filed and permit consideration of a substantial claim raised in a subsequent application. I would overrule *Graves* to the extent that it precludes consideration of a statutory claim that initial habeas counsel's performance was so incompetent as to render the initial application frivolous and, therefore, void.

### 1. 11.071 Applicants Are Statutorily Entitled To Minimally Competent Representation

Although I concede the correctness of this Court's ultimate conclusion in *Graves* that there is no established constitutional right to the effective assistance of post-conviction counsel, I maintain that Article 11.071 provides some minimal safeguards against wholly incompetent representation by appointed habeas counsel. *See* Tex. Code Crim. Proc. art. 11.071, § 2(a) (providing that an applicant "shall be *represented* by competent counsel." (emphasis added)). In *Graves,* the Court interpreted Article 11.071 to entitle an applicant to nothing more than counsel who is "competent" at the time of appointment. 70 S.W.3d at 114 (stating that statute's reference to "competent" counsel "concern[s] the initial appointment of counsel and continuity of representation rather than the final product of representation"). I disagree with this narrow interpretation because it does not account for the statute's requirement that an applicant be "represented" by competent counsel. This phrasing suggests that an applicant's entitlement to competent counsel extends throughout the course of representation. Had the Legislature wished to provide only for appointment of competent counsel, it could have said so. It did not.

Similarly, as applicant has argued in his application, Article 11.071 provides that appointed counsel "shall investigate expeditiously" the "factual and legal grounds" for relief, both "before and after the appellate record is filed." *See* Tex.Code Crim. Proc. art. 11.071, § 3(a); *Ex parte Mines,* 26 S.W.3d 910, 912 (Tex.Crim.App.2000). Where, as here, habeas counsel has raised only frivolous claims, such as claims premised on a repealed statutory provision, or non-cognizable claims, such as record-based claims that were rejected on direct appeal, a presumption arises that counsel has not undertaken an independent investigation of the grounds for relief. Such a failure by counsel is inconsistent with the statutory terms of representation and, moreover, eviscerates the legislative purpose underlying Article 11.071. *See* Debate on H.B. 440, Texas House, Second Reading, 74th Leg., R.S. (May 18, 1995), statement of Rep. Pete Gallego (stating that habeas applicants will "get lawyers from day one. They get fully paid investigators. They get all of the investigation ... everyone who is convicted will have a fully paid investigation into ... any claim they can possibly raise").

Reading Sections 2(a) and 3(a) in conjunction, I conclude that appointed counsel in an 11.071 proceeding must demonstrate a minimum level of competence in his representation of an applicant and in his investigation of any factual or legal bases for relief. *See* Tex.Code Crim. Proc. art. 11.071, §§ 2(a), 3(a); *Boykin v. State,* 818 S.W.2d 782, 785–86 (Tex.Crim.App.1991). I would hold that an initial application was improperly filed and permit consideration of a substantial claim in a later proceeding if an applicant makes a showing that (1) initial habeas counsel wholly failed to perform his statutory duties under Article 11.071, and (2) counsel's incompetence led to the forfeiture of a substantial claim for

relief. Such an applicant has been deprived of one meaningful opportunity to present his constitutional claims, and, as such, this Court is not barred from considering those claims at a later time. *See Ex parte Medina,* 361 S.W.3d 633, 642 (Tex. Crim.App.2011) (stating that, as result of habeas counsel's "intentional failure to plead specific facts," 11.071 applicant was, through no fault of his own, deprived of one full and fair opportunity to present his constitutional or jurisdictional claims); *Kerr,* 64 S.W.3d at 420.

### 2. Statutory Claim Cognizable For Narrow Purpose of Determining Whether Application is Subsequent

With respect to the issue of cognizability, I would hold that a claim involving a statutory violation of Article 11.071, including a claim that counsel wholly failed to investigate any factual or legal bases for relief, is cognizable for the limited purpose of determining whether this Court is required to apply the bar on subsequent writs. *See* TEX.CODE CRIM. PROC. art. 11.071, §§ 2(a), 3(a), 5(a). In *Graves,* this Court held that statutory violations of Article 11.071 "simply are not cognizable" because habeas is reserved for constitutional or jurisdictional claims. *See Graves,* 70 S.W.3d at 116–117 (holding that because claim was "not [ ] constitutional," but rather was "based solely upon an alleged violation of the habeas statute itself," it was not cognizable). In *Graves,* this Court relied

on the Supreme Court's decision in *Coleman v. Thompson* for the unequivocal proposition that an applicant in a post-conviction proceeding has no constitutional right to the effective assistance of counsel and that, therefore, a claim regarding habeas counsel's ineffectiveness may not be raised in a habeas proceeding. *Graves,* 70 S.W.3d at 110 n. 25 (citing *Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). That reliance has now been undermined by two recent Supreme Court decisions, *Martinez v. Ryan* and *Trevino v. Thaler. See id.* at 117–18; *Martinez v. Ryan,* 566 U.S. ——, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272 (2012); *Trevino v. Thaler,* 569 U.S. ——, 133 S.Ct. 1911, 1921, 185 L.Ed.2d 1044 (2013). In *Martinez,* among other matters, the Supreme Court clarified that *Coleman* expressly "left open" the question of "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Martinez,* 132 S.Ct. at 1315 (citing *Coleman,* 501 U.S. at 755, 111 S.Ct. 2546). The Supreme Court went on to hold that state prisoners may raise the issue of state habeas counsel's ineffectiveness for the narrow purpose of deciding whether to excuse a procedural default of a substantial underlying ineffective-assistance claim in a federal habeas proceeding. *See Trevino,* 133 S.Ct. at 1921; *Martinez,* 132 S.Ct. at 1316.[9] In doing so, the Supreme Court

---

**9.** In *Trevino,* the Supreme Court held that when a state's procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, then the holding in *Martinez v. Ryan* applies. *See Trevino v. Thaler,* 569 U.S. ——, 133 S.Ct. 1911, 1921, 185 L.Ed.2d 1044 (2013) (citing *Martinez v. Ryan,* 566 U.S. ——, 132 S.Ct. 1309, 1316, 182 L.Ed.2d 272 (2012)). In *Martinez v. Ryan,* the Supreme Court held,

[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the [state's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Martinez,* 132 S.Ct. at 1320. A "substantial" claim is one that has "some merit." *See Martinez,* 132 S.Ct. at 1317 (citing *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). *Martinez* thus created an exception to the federal procedural-default

modified the holding of *Coleman*, in which it had held that such a claim was not cognizable on habeas corpus because it did not, by itself, constitute a basis for relief from the judgment or sentence. *See Coleman*, 501 U.S. 722, 747–48, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In *Martinez* and *Trevino*, the Supreme Court recognized for the first time that, although ineffective assistance of post-conviction counsel may not constitute a constitutional violation, the issue of habeas counsel's performance is nevertheless relevant in a subsequent post-conviction proceeding when it answers the preliminary question of whether an underlying claim should be procedurally barred. *See Trevino*, 133 S.Ct. at 1911; *Martinez*, 132 S.Ct. at 1318.

Although I recognize that the holdings of *Martinez* and *Trevino* apply only in federal court, I would submit to this Court that the rationale underlying those decisions applies with equal force to our own treatment of certain claims for post-conviction relief, in particular, claims of ineffective assistance of counsel. In *Martinez*, the Supreme Court stated that consideration of habeas counsel's ineffectiveness as a basis for excusing procedural default was "necessary" to "protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel." *See Martinez*, 132 S.Ct. at 1315; *see also Trevino*, 133 S.Ct. at 1919 (stating that Texas's post-conviction system would create "significant unfairness" if habeas counsel's ineffectiveness could not serve as basis for excusing procedural default). That is because, when the habeas proceeding represents the first meaningful opportunity for a prisoner to raise an ineffective-assistance-of-trial-counsel claim, that proceeding be-comes more like a direct appeal as to that claim—it is the prisoner's one and only opportunity to raise that claim with the assistance of counsel. *Martinez*, 132 S.Ct. at 1317. Moreover, the Supreme Court observed that, when an attorney errs in initial-review collateral proceedings, inter-locking state and federal procedural-default rules make it unlikely that any court will ever hear the merits of the prisoner's underlying claim. *See Trevino*, 133 S.Ct. at 1921 (noting that, without exception to procedural-default rules on the basis of attorney error in a post-conviction proceeding, an applicant would be "deprive[d] ... of any opportunity at all for review of an [ineffective-assistance] claim"); *Martinez*, 132 S.Ct. at 1320 (noting that equitable exception necessary because otherwise "no court will review the prisoner's [Sixth Amendment] claims"). This possibility, the Court noted, was of "particular concern" in light of the fact that the right to effective assistance of counsel at trial is a "bedrock principle in our justice system." *Martinez*, 132 S.Ct. at 1317 (citing *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). The equitable exception of *Martinez*, applicable to Texas through *Trevino*, acknowledges that the initial state habeas proceeding, if under-taken without the assistance of competent counsel, "may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S.Ct. at 1318; *see also Trevino*, 133 S.Ct. at 1919–20 (considering "whether, as a systematic matter, Texas affords meaningful review of a claim of ineffective assistance of trial counsel," and concluding that "it does not").

___

doctrine, which normally bars a federal habeas court from considering the merits of any claims that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See id.* at 1316 (citing *Cole-man v. Thompson*; 501 U.S. 722, 747–48, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 84–85, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

All of these same concerns apply at the state level. The case before us serves as a prime example of what happens when counsel in the initial habeas proceeding raises only non-cognizable or facially frivolous claims: as a result of lockstep state and federal procedural default rules, and as predicted by the Supreme Court in *Martinez*, initial habeas counsel's incompetence operates to bar any further post-conviction review in any court. This is an outcome that jeopardizes both the integrity of the underlying conviction and of this Court's judicial processes. In light of the foregoing, I would hold that a claim that applicant's appointed habeas counsel failed to abide by the minimum standards of competence set forth in Article 11.071 is cognizable for the limited purpose of deciding whether this Court is required to apply the statutory bar on subsequent writs. To overcome the bar on subsequent writs, however, I would additionally require an applicant to show that the underlying claim that was forfeited as a result of habeas counsel's error has some merit. I discuss this requirement in the context of applicant's third claim below.

**B. Applicant Has Made a Preliminary Showing that His Third Claim Warrants Review on the Merits**

As to the merits of applicant's underlying ineffective-assistance-of-trial-counsel claim, I conclude that applicant has presented a substantial claim that warrants remand to the trial court. Applicant alleges that his trial counsel performed deficiently by unreasonably failing to investigate, develop, and present mitigating

evidence to the jury at the punishment phase of his capital murder trial and that he suffered prejudice as a result of counsel's deficient performance.[10] To prevail on a claim of ineffective assistance of counsel, applicant must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To demonstrate deficient performance, applicant must show that his attorney's performance fell below an objective standard of reasonableness, as judged by prevailing professional norms. *Strickland*, 466 U.S. at 668, 104 S.Ct. 2052; *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). To satisfy the prejudice prong, applicant must also demonstrate a reasonable probability that, had counsel presented the available mitigating evidence, at least one juror would have answered the special issues differently. *Ex parte Gonzales*, 204 S.W.3d 391, 393 (Tex.Crim. App.2006); *see Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir.2003). A reasonable probability is one that is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.[11]

In particular, defense counsel in a capital murder proceeding is obligated to conduct a reasonable mitigation investigation. *Gonzales*, 204 S.W.3d at 393; *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Strickland*, at 691, 104 S.Ct. 2052 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"). Any decision

---

10. *See* U.S. Const. Amend. VI; *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Ex parte Gonzales*, 204 S.W.3d 391, 393 (Tex. Crim.App.2006).

11. This Court has previously recognized that the "reasonable probability" standard of proof is lower than the preponderance standard. *See Gonzales*, 204 S.W.3d at 394; *see also Bouchillon v. Collins*, 907 F.2d 589, 595 (5th Cir.1990).

not to investigate potential evidence or witnesses must be directly assessed for reasonableness under the circumstances. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052; *Ex parte Napper,* 322 S.W.3d 202, 246 (Tex.Crim.App.2010) ("When trial counsel does not conduct a complete investigation, his conduct is 'reasonable only to the extent that reasonable professional judgments support the limitations on investigation.'"); *Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527 (applicable standard is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [applicant's] background *was itself reasonable*"). The Court's inquiry in such cases has focused on whether a reasonable investigation should have uncovered the mitigating evidence. See *Gonzales,* 204 S.W.3d at 394.

Applicant alleges that his trial counsel failed to investigate and present readily available mitigating evidence relating to his exposure at a young age to domestic violence and physical abuse by his father. Applicant further contends that he was forced to work at a young age; that he was routinely given alcohol by his father as a young child; that he grew up in a crime-ridden neighborhood that was plagued by drugs and violence; and that he has suffered from undiagnosed Asperger's Syndrome throughout his life. To support his allegations, applicant presents affidavits from eleven individuals who attest to the following facts and state that they were not asked to provide this information at applicant's capital murder trial, but would have provided this information had they been asked to do so by defense counsel:

- Applicant's father was "violent toward [applicant]" and "beat [applicant] for any little reason or for no reason at all." Beatings and "whippings" were committed using "electrical cords, belts, switches" or "spark plug wires." Once, applicant's father beat him severely for going to a swimming pool without permission. Applicant sometimes "wound up with welts all over his body from the beatings he received from his father."

- Applicant's father was "controlling and abusive" towards applicant's mother and used to beat applicant's mother "brutally." Applicant's father hit his mother "all the time" while they were together, to the point that applicant's mother had bruises on her face and "all over her body." Applicant's father reportedly once kicked applicant's mother so hard that she "ruptured a disk in her back" and was in the hospital for weeks. Applicant, as the oldest child in the family, "saw the things his dad did to his mom" and was "devastated by what he saw." As a result of domestic violence, applicant's mother and father separated shortly before her death.

- After remarrying, applicant's father also beat applicant's step-mother and applicant "had to break his parents up" to stop the fighting.

- Applicant's father "exposed [him] to alcohol, to crime, to drugs" at a young age; applicant's father "started [applicant] drinking alcohol at an extremely young age." By one affiant's account, applicant's father started giving him alcohol when applicant was five years old.

- Applicant's father exposed him to marital infidelity and prostitution at a young age. Applicant's father allegedly had "illicit affairs with many women" and "made no effort to hide it." This resulted in applicant having "all kinds of half-brothers and sisters," who at various times came to live in the family home. One affiant reported that applicant had twenty-two siblings as a result of his father's numerous liaisons.

- Applicant's step-mother "favored her children over [applicant and his sib-

lings]" and would use applicant's Social Security benefits, received as a result of his mother's death, to support her own children instead. As a result of tensions at home, applicant went to live with his grandparents in Louisiana for several years as a teenager. Although this was a relative improvement over his home life, his grandfather had a "serious" drinking problem.

- Applicant was forced to work as a child in his father's automotive shop, which was described as a "chop shop" that applicant's father "used to commit crimes." Applicant and his siblings "grew up working on cars" and were not permitted to play because they were expected to work. As a result of the illegal activities that took place in the shop, applicant's father was constantly "in and out of the penitentiary."

- Applicant's step-mother and her family were "into drugs" and there was "a lot of drugging and drinking going on in that house." Applicant's step-mother's family was "into drugs" and sold drugs out of applicant's father's auto shop.

- Applicant grew up in a "rough," "violent" neighborhood. "Drugs and violence were everywhere." Applicant was "surrounded by people with a criminal mentality," and "most people in the neighborhood carried guns." Applicant's father "always" carried a gun and there were "always" guns in applicant's house. One affiant alleged that applicant had witnessed his father shoot at people "a bunch of times" during his childhood. Another affiant stated and that someone once pulled a gun on applicant and shot him in the leg with buckshot.

- Applicant started using heavy drugs, in particular, crack cocaine, in his twenties and began to change. At the time of the offense, applicant was "heavy into drugs and alcohol" and had become a "different person." He "wasn't in his right mind" when he committed the offense. According to the affidavit of his step-sister Phyllis Taylor, who survived the shooting, on the night of the offense applicant was "so high" and the "drugs were controlling him."

- Applicant may have had a brain aneurysm at the age of twenty-six or twenty-seven;

- Applicant has "always been slow and gullible"; he was "always slower than his peers" and was "often confused" by jokes or conversation.

- Applicant additionally offered the forensic psychological/neuropsychological evaluation of Dr. Diane Mosnik, neuropsychologist, who recently examined applicant and concluded that applicant has Asperger's Syndrome. In her report, Mosnik described applicant as "naive" and "unaware of social nuances." She notes that applicant "exhibited profound difficulty in accurately recognizing and identifying certain basic emotions, even when presented in a clear and straightforward manner[.]" Applicant's "social interaction skills appeared to fall well below developmental age expectations."

Applicant has presented a substantial volume of mitigating evidence that he claims was available, but was not presented, at his capital murder trial. Although the jury did hear some mitigating evidence, it did not receive any testimony regarding several key categories of mitigating evidence, including (1) that applicant was allegedly abused as a child, (2) that his father was abusive toward applicant's mother and that applicant witnessed this abuse, and (3) that applicant's home life as a child was plagued by crime, drugs and violence.

This Court has previously recognized that suffering abuse as a child is a category of evidence that can, in some cases,

have significant mitigating value. *See Gonzales,* 204 S.W.3d at 395. To the extent that applicant has alleged that his counsel did not inquire at all into whether applicant had been abused or exposed to domestic violence as a child, he has made a preliminary showing of deficient performance. *Id.* ("We think that, at the time of the applicant's trial, an objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child.").

As to prejudice, I conclude that the volume and persuasive value of the mitigation evidence presented in this application substantially changes the sentencing profile of applicant that was before the jury. The sentencing profile presented by trial counsel essentially described applicant as a normal, mostly law-abiding person whose criminal acts in this case were totally unexpected and out of character. In contrast, the sentencing profile presented in the habeas record essentially describes applicant as a long-time drug addict who was high during the murders; an alcoholic who began drinking at the age of five and who was encouraged to drink by his father as a child; a victim of child abuse and a witness to frequent episodes of domestic violence; and a sufferer of Asperger's Syndrome. In particular, the evidence pertaining to applicant's exposure to physical abuse and domestic violence is the type of evidence that may be highly relevant to a jury's balancing of mitigation evidence. *See id.* (citing *Wiggins,* 539 U.S. at 538, 123 S.Ct. 2527) (finding prejudice prong satisfied where mitigating evidence presented at the habeas hearing was substantially greater and more compelling than that actually presented by the applicant at his trial and concluding that available mitigating evidence "might well have influenced the jury's appraisal" of applicant's moral culpability). Particularly in light of the facts of this offense, which, by all accounts, resulted from a tumultuous romantic relationship gone terribly wrong, I am persuaded that applicant has made at least an initial showing of a reasonable probability that, had the jury received additional evidence as detailed above, at least one juror would have reached a different result in the punishment phase. On remand, a habeas court would be able to more particularly sort through these facts to decipher the extent to which this evidence may have altered applicant's sentencing profile. For now, I would determine that this Court has jurisdiction to address the merits of applicant's claim that his trial attorneys were ineffective by failing to investigate and present mitigation evidence, and I would remand that claim for an evidentiary hearing in the trial court.

### III. Conclusion

I agree with this Court's statement in *Graves* that society has a "legitimate interest in [the] finality of judgments." *Graves,* 70 S.W.3d at 117. But I also adhere to the principle, embraced by the Legislature and this Court, that individuals who are sentenced to death should be afforded "one full and fair opportunity" to present their constitutional claims for post-conviction relief. *Id.; see also Medina,* 361 S.W.3d at 642. The Supreme Court's recent criticism of Texas's failure to provide a vehicle by which prisoners may effectively challenge the effectiveness of trial counsel's performance undermines this Court's reasoning in *Graves* and, on this basis, I conclude that this Court should abrogate *Graves,* in part. Furthermore, when an applicant's statutory entitlement to minimally competent assistance of habeas counsel has been denied, and where such denial has led to the forfeiture of a substantial claim for relief, this Court should declare the initial filing

improper and adjudicate the claim on the merits.

Having concluded that the applicant in this case has made such a showing with respect to his third claim, I respectfully dissent from the Court's refusal to exercise its post-conviction jurisdiction in this case.